# CREDIT AGREEMENT

CREDIT AGREEMENT dated as of May 24th, 2018 between ST HOLDINGS TOPCO LLC and ABILITY INSURANCE COMPANY, INC., as the Lender (the "Lender"). The parties hereto hereby agree as follows:

## ARTICLE I
## DEFINITIONS

SECTION 1.01. Defined Terms. As used in this Agreement, the following terms have the meanings specified below:

"Affiliate" as to any Person, any other Person that, directly or indirectly, is in control of, is controlled by, or is under common control with, such Person. For purposes of this definition, "control" of a Person means power, directly or indirectly, either to (a) vote 33% or more of the securities having ordinary voting power for the election of directors (or persons performing similar functions) or such Person or (b) direct or cause the direction of the management and policies of such Person, whether by contract or otherwise.

"Anti-Corruption Laws" means all laws, rules, and regulations of any jurisdiction applicable to the Borrower or its Subsidiaries from time to time concerning or relating to bribery or corruption.

"Borrower Pledge and Security Agreement" means the Pledge and Security Agreement, dated as of the date hereof, by the Borrower in favor of the Lender.

"Borrower" ST Holdings Topco LLC, a Delaware limited liability company.

"Business Day" means each day which is not a Saturday, Sunday or other day on which banking institutions are not required by law or regulation to be open in the State of New York.

"Cash Equivalents" means any of the following types of Investments, to the extent owned by the Borrower:

(a) (i) Dollars and (ii) readily marketable obligations issued or directly and fully guaranteed or insured by the United States or any agency or instrumentality thereof, in each case having maturities of not more than twelve (12) months from the date of acquisition thereof; provided that the full faith and credit of the United States is pledged in support thereof;

(b) time deposits with, or insured certificates of deposit or bankers' acceptances of, any commercial bank that (i) is organized under the laws of the United States, any state thereof or the District of Columbia or is the principal banking subsidiary of a bank holding company organized under the laws of the United States, any state thereof or the District of Columbia, and is a member of the Federal Reserve System, (ii) issues (or the parent of which issues) commercial paper rated at least P-2 (or the then equivalent grade) by Moody's Investors Services, Inc. ("Moody's") or at least A-2 (or the then equivalent grade) by Standard & Poor's Financial Services LLC ("S&P") and (iii) has combined capital and surplus of at least $500,000,000 (any such bank being an "Approved Domestic Bank"), in each case with maturities of not more than three hundred sixty-five (365) days from the date of acquisition thereof;

(c) commercial paper and variable or fixed rate notes issued by an Approved Domestic Bank (or by the parent company thereof) or any variable or fixed rate note issued by, or guaranteed by, a domestic corporation rated A-2 (or the equivalent thereof) or better by S&P or P-2 (or the equivalent thereof) or better by Moody's, in each case with maturities of not more than two hundred seventy (270) days from the date of acquisition thereof;

(d) marketable short-term money market and similar funds (including such funds investing a portion of their assets in municipal securities) having a rating of at least P-2 or A-2 from either Moody's or S&P, respectively (or, if at any time neither Moody's nor S&P shall be rating such obligations, an equivalent rating from another nationally recognized statistical rating agency selected by the Borrower);

(e) repurchase agreements entered into by any Person with a bank or trust company or recognized securities dealer having capital and surplus in excess of $500,000,000 for direct obligations issued by or fully guaranteed or insured by the United States government or any agency or instrumentality of the United States in which such Person shall have a perfected first priority security interest (subject to no other Liens) and having, on the date of purchase thereof, a Fair Market Value of at least 100% of the amount of the repurchase obligations;

(f) investments, classified in accordance with GAAP as current assets of the Borrower, in money market investment programs registered under the Investment Company Act of 1940, which are administered by financial institutions having capital of at least $500,000,000, and the portfolios of which are limited such that at least 95% of such investments are of the character, quality and maturity described in clauses (a) through (e) of this definition; and

(g) investment funds investing at least 95% of their assets in securities of the types (including as to credit quality and maturity) described in clauses (a) through (f) above.

"CERCLA" means the Comprehensive Environmental Response, Compensation, and Liability Act of 1980.

"CERCLIS" means the Comprehensive Environmental Response, Compensation, and Liability Information System maintained by the U.S. Environmental Protection Agency.

"Closing Date" means the date on which the conditions specified in Section 4.01 are satisfied.

"Code" means the Internal Revenue Code of 1986, as amended.

"Collateral" means all collateral which is identified in, and at any time will be covered by the Collateral Documents and any other property or assets of the Borrower, whether tangible or intangible and whether real or personal, now existing or hereafter acquired, that may at any time be or become subject to a security interest or Lien in favor of the Lender, on behalf of the Lenders, to secure any Obligations pursuant to any one or more of the Credit Documents.

"Collateral Documents" means, collectively, the Borrower Pledge and Security Agreement, the Parent Pledge and Security Agreement, the ST Holdings Pledge and Security Agreement, and any other documents granting a Lien upon any Collateral as security for payment of the Obligations.

"Confidential Information" means all information relating to the Collateral or to the Borrower or any of its Affiliates or any of their respective businesses, other than any such information that (i) is or becomes generally available to the public on a non-confidential basis, (ii) is known to the Lender or any Lender (or other party required to keep information confidential pursuant to this Agreement) on a non-confidential basis prior to the time of disclosure of such information by the Borrower, (iii) is independently developed by the Lender or any Lender (or other party required to keep information confidential pursuant to this Agreement), (iv) is permitted in writing by the Borrower to be disclosed to third parties on a non-confidential basis, or (v) is or was publicly disclosed by the Borrower.

"Credit Documents" means this Agreement, the Springing Guaranty, the Borrower Pledge and Security Agreement, the Parent Pledge and Security Agreement, the ST Holdings Pledge and Security Agreement, the Note, and any other documents delivered to the Lender or Lenders or their Affiliates by the Borrower evidencing or securing the Term Loan or the Collateral.

"Default" means any event or condition which constitutes an Event of Default or which upon notice, lapse of time or both would, unless cured or waived, become an Event of Default.

"Disposition" or "Dispose" means the sale, transfer, license, sublicense, lease, any other disposition of any property by any Person (including any sale and leaseback transaction and any issuance of equity interests by a subsidiary of such Person), including any sale, assignment, transfer or other disposal, with or without recourse, of any notes or accounts receivable or any rights and claims associated therewith and any reinsurance or novation arrangement or transaction.

"EIBV" means Exceptional Innovation B.V.

"EIIBV" means Exceptional Innovation Intermediate B.V.

"Environmental Laws" means any and all federal, state, local and foreign statutes, laws, including applicable common law, regulations, ordinances, rules, judgments, orders, decrees or governmental restrictions relating to pollution, the protection of the environment, the release of Hazardous Materials into the environment and human exposure to Hazardous Materials, including those related to the treatment, transport, storage and disposal of Hazardous Materials, air emissions and discharges to public pollution control systems.

"Environmental Liability" means any liability, contingent or otherwise (including any liability for damages, costs of environmental remediation, monitoring or oversight by a Governmental Authority, fines, penalties or indemnities), directly or indirectly resulting from or based upon (a) any actual or alleged violation of any Environmental Law, (b) the generation, use, handling, transportation, storage, treatment or disposal of any Hazardous Materials, (c) human exposure to any Hazardous Materials, (d) the release or threatened release of any Hazardous Materials into the environment or (e) any contract, agreement or other binding consensual arrangement pursuant to which liability is assumed or imposed with respect to any of the foregoing.

"Environmental Permit" means any permit, approval, identification number, license or other authorization required under any Environmental Law.

"ERISA Affiliate" means (a) Any corporation which is a member of the same controlled group of corporations (within the meaning of Section 414(b) of the Code) as the Issuer, (b) a trade or

business (whether or not incorporated) under common control (within the meaning of Section 414(c) of the Code) with the Issuer or (c) a member of the same affiliated service group (within the meaning of Section 414(m) of the Code) as the Issuer, any corporation described in clause (a) above or any trade or business described in clause (b) above.

"ERISA Event" means (a) a Reportable Event with respect to a Plan; (b) the withdrawal of the Borrower or any ERISA Affiliate from a Plan subject to Section 4063 of ERISA during a plan year in which such entity was a "substantial employer" (as defined in Section 4001(a)(2) of ERISA) or a cessation of operations that is treated as such a withdrawal under Section 4062(e) of ERISA; (c) a complete or partial withdrawal by the Borrower or any ERISA Affiliate from a Multiemployer Plan or notification that a Multiemployer Plan is in reorganization (within the meaning of Section 4241 of ERISA) or insolvent (within the meaning of Section 4245 of ERISA); (d) the filing of a notice of intent to terminate or the treatment of a Plan amendment as a termination under Section 4041 or 4041A of ERISA, respectively, (e) the institution by the PBGC of proceedings to terminate a Plan or Multiemployer Plan; (f) an event or condition which constitutes grounds under Section 4042 of ERISA for the termination of, or the appointment of a trustee to administer, any Plan or Multiemployer Plan; (g) the determination that any Plan is considered an at-risk plan within the meaning of Section 430 of the Code or Section 303 of ERISA; (h) the determination that any Multiemployer Plan is considered a plan in endangered or critical status within the meaning of Sections 431 and 432 of the Code or Sections 304 and 305 of ERISA; (i) the imposition of any liability under Title IV of ERISA, other than for PBGC premiums due but not delinquent under Section 4007 of ERISA, upon the Borrower or any ERISA Affiliate; (j) the conditions for the imposition of a lien under Section 430(k) of the Code or Section 303(k) of ERISA shall have been met with respect to any Plan; or (k) any other event or condition with respect to a Plan or Multiemployer Plan that could result in liability of the Borrower, other than in the usual course.

"Event of Default" has the meaning set forth in Article VI.

"Excluded Taxes" means any of the following Taxes imposed on or with respect to the Borrower or required to be withheld or deducted from a payment to the Lender, (a) Taxes imposed on or measured by income (however denominated), franchise Taxes, and branch profits Taxes, in each case, (i) imposed as a result of the Lender being organized under the laws of, having its principal office or its applicable lending office located in, the jurisdiction imposing such Tax (or any political subdivision thereof) or (ii) that are Other Connection Taxes, (b) U.S. federal withholding Taxes imposed on amounts payable to or for the account of the Lender with respect to an applicable interest in a Term Loan or Term Loan Commitment pursuant to a law in effect on the date on which (i) the Lender acquires such interest in the Term Loan or Term Loan Commitment or (ii) the Lender changes its lending office, and (c) any U.S. federal withholding Taxes imposed under FATCA; provided, however, for the avoidance of doubt, that Excluded Taxes shall not include any Taxes described in clause (b) of the definition of Other Taxes.

"Extension" has the meaning given to such term in Section 2.07(a).

"Extension Fee" has the meaning given to such term in Section 2.07(b).

"Extraordinary Receipt" means any cash received by or paid to or for the account of any Person in the nature of proceeds of insurance, condemnation awards (and payments in lieu thereof) and indemnity payments (to the extent not attributable to a purchase price adjustment).

"Fair Market Value" means, with respect to any asset or group of assets on any date of determination, the value of the consideration obtainable in a sale of such asset at such date of determination assuming a sale by a willing seller to a willing purchaser dealing at arm's length and arranged in an orderly manner over a reasonable period of time having regard to the nature and characteristics of such asset, as reasonably determined by the Borrower in good faith (which shall be conclusive if reasonably determined in good faith).

"FATCA" means Sections 1471 through 1474 of the Code, as of the date of this Agreement (or any amended or successor version), any current or future regulations or official interpretations thereof and any agreements entered into pursuant to Section 1471(b)(1) of the Code, and any fiscal or regulatory legislation, rules or practices adopted pursuant to any intergovernmental agreement entered into in connection with the implementation of such Sections of the Code.

"Final Maturity Date" means (a) January 13, 2020 (or any such date pursuant to an extension request pursuant to Section 2.07 (which, for the avoidance of doubt, may not be later than June 12, 2020)), or (b) such earlier date on which the Loan shall become due and payable in accordance with the terms of this Agreement, whether by acceleration or otherwise.

"FRB" means the Board of Governors of the Federal Reserve System of the United States.

"GAAP" means generally accepted accounting principles in the United States of America.

"Governmental Authority" means the government of the United States of America, any other nation or any political subdivision thereof, any state or locality, any political subdivision of the foregoing, and any agency, authority, instrumentality, regulatory body, court, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government.

"Hazardous Materials" means all radioactive and all hazardous or toxic substances, materials or wastes, including petroleum or petroleum distillates, asbestos or asbestos-containing materials, polychlorinated biphenyls, radon gas, infectious or medical wastes and all other substances or wastes of any nature regulated as "hazardous" or "toxic," or as a "pollutant" or a "contaminant," pursuant to any Environmental Law.

"Included Patents" means those patents designated as Included Patents on Schedule IX.

"Indebtedness" of a Person means (a) all obligations of such Person for borrowed money, (b) all obligations of such Person evidenced by bonds, debentures, notes or similar instruments, or upon which interest payments are customarily made, (c) all obligations (excluding any prepaid interest thereon) of such Person under conditional sale or other title retention agreements relating to property purchased by such Person (other than customary reservations or retentions of title under agreements with suppliers entered into in the ordinary course of business), (d) all obligations (including, without limitation, earnout obligations) of such Person incurred, issued or assumed as the deferred purchase price of property or services purchased by such Person (other than (i) trade debt incurred in the ordinary course of business and due within six months of the incurrence thereof and (ii) expenses accrued in the ordinary course of business) which would appear as liabilities on a balance sheet of such Person, (e) all obligations

of such Person under take-or-pay or similar arrangements or under commodities agreements, (f) all Indebtedness of others secured by (or for which the holder of such Indebtedness has an existing right, contingent or otherwise, to be secured by) any Lien on, or payable out of the proceeds of production from, property owned or acquired by such Person, whether or not the obligations secured thereby have been assumed, (g) all guaranty obligations of such Person with respect to Indebtedness of another Person, (h) the principal portion of all capital lease obligations plus any accrued interest thereon, (i) all net obligations of such Person under hedging agreements, (j) the maximum amount of all letters of credit issued or bankers' acceptances facilities created for the account of such Person and, without duplication, all drafts drawn thereunder (to the extent unreimbursed), (k) all preferred equity interests issued by such Person, (l) the principal balance outstanding under any synthetic lease, tax retention operating lease, off-balance sheet loan or similar off-balance sheet financing product plus any accrued interest thereon, (m) all obligations of any partnership or unincorporated joint venture in which such Person is a general partner or a joint venture solely to the extent such obligations are recourse to such Person and (n) obligations of such Person under non-compete agreements to the extent such obligations are quantifiable contingent obligations of such Person under GAAP principles.

"Indemnified Taxes" means (a) Taxes, other than Excluded Taxes, imposed on or with respect to any payment made by or on account of any obligation of the Borrower under this Agreement and (b) to the extent not otherwise described in (a), Other Taxes.

"Indemnitee" has the meaning given to such term in Section 8.03(b).

"Insolvency Proceeding" means any case, proceeding or other action by or against any Person (a) under any existing or future law (including any agency or department with jurisdiction over insurance companies) of any jurisdiction, domestic or foreign, relating to bankruptcy, insolvency, reorganization, rehabilitation, liquidation, conservatorship, receivership or relief of debtors, seeking to have an order for relief entered with respect to it, or seeking to adjudicate it a bankrupt or insolvent, or seeking reorganization, arrangement, adjustment, winding up, liquidation, dissolution, composition, rehabilitation or other relief with respect to it or its debts, or (b) seeking appointment of a receiver, trustee, custodian, conservator, rehabilitator, liquidator or other similar official for it or for all or any substantial part of its assets.

"Intellectual Property" the collective reference to all rights, priorities and privileges relating to intellectual property, whether arising under the United States, multinational or foreign laws or otherwise, including copyrights, copyright licenses, patents, patent licenses, trademarks, trademark licenses, technology, know-how and processes, and all rights to sue at law or in equity for any infringement or other impairment thereof, including the right to receive all proceeds and damages therefrom.

"Interest Payment Date" means the last day of each month, commencing on May 30, 2018.

"Interest Period" means the period following the end of the immediately preceding Interest Period to but excluding the next Interest Payment Date.

"Investment" means, as to any Person, any direct or indirect investment by such Person, whether by means of (a) the purchase or other acquisition of Equity Interests or debt or other securities of another Person, (b) a loan, advance or capital contribution to, guarantee or assumption of debt of, or purchase or other acquisition of any other debt or equity participation or interest in, another Person, including any partnership or joint venture interest in such other Person and any arrangement pursuant to

which the investor incurs debt of the type referred to in clause (h) of the definition of Indebtedness in respect of such Person or (c) the purchase or other acquisition (in one transaction or a series of transactions) of all or substantially all of the property and assets or business of another Person or assets constituting a business unit, line of business or division of such other Person.

"ITT" means interTouch Holdings, LLC.

"Lien" means, with respect to any asset, (a) any mortgage, deed of trust, lien, pledge, hypothecation, encumbrance, charge or security interest in, on or of such asset, (b) the interest of a vendor or a lessor under any conditional sale agreement, capital lease or title retention agreement (or any financing lease having substantially the same economic effect as any of the foregoing) relating to such asset and (c) in the case of securities, any purchase option, call or similar right of a third party with respect to such securities.

"Loan Parties" means, collectively, the Borrower and each other Grantor under the Collateral Documents and each individually a "Loan Party".

"London Banking Day" means any day on which commercial banks are open for general business (including dealings in foreign exchange and foreign currency deposits) in London, England.

"Material Adverse Effect" means (a) a material adverse change in, or a material adverse effect on the operations, business, assets, or financial condition of the Borrower and its Subsidiaries taken as a whole, (b) a material impairment of the rights and remedies of the Lender or any Lender under any Credit Document, or of the ability of any Loan Party to perform its obligations under any Credit Document to which it is a party, or (c) a material adverse effect upon the legality, validity, binding effect or enforceability against any Loan Party of any Credit Document to which it is a party.

"Material Non-Public Information" means any Confidential Information constituting material non-public information within the meaning of the rules and regulations of the Exchange Act.

"Material Subsidiary" means the Subsidiaries of Borrower listed on Schedule X attached hereto which, as of the date hereof, together represent 90% or more of the consolidated total assets of the Borrower and its Subsidiaries and 90% or more of the aggregate EBITDA of the Borrower and its Subsidiaries.

"Multiemployer Plan" means a "multiemployer plan" as defined in Section 4001(a)(3) of ERISA, to which the Borrower or any ERISA Affiliate makes or is obligated to make contributions.

"Note" means promissory note made by the Borrower in favor of Lender evidencing the Term Loan made by such Lender.

"NPL" means the National Priorities List under CERCLA.

"Obligations" all now existing or hereafter arising obligations of the Borrower under the Credit Documents, whether primary or secondary, direct or indirect, absolute or contingent, joint or several, secured or unsecured, due or not, liquidated or unliquidated, arising by operation of law or otherwise, whether for principal, interest, fees, expenses or otherwise (including, without limitation, interest, fees, costs or other payments on the Obligations paid or accrued after the commencement of an Insolvency Proceeding and whether or not such claims are deemed allowed or recoverable in any

Insolvency Proceeding, and payment of or for adequate protection pursuant to any Insolvency Proceeding), together with all costs of collection or enforcement, including, without limitation, reasonable attorneys' fees incurred in any collection efforts or in any action or proceeding.

"Operating Agreement" means that certain Limited Liability Company Operating Agreement of ST Holdings Topco LLC, dated as of January 12, 2018.

"Operating Entities" means each Subsidiary of the Borrower set forth on Schedule V-C.

"Other Connection Taxes" means, with respect to the Lender, Taxes imposed as a result of a present or former connection between the Lender and the jurisdiction imposing such Tax (other than connections arising solely from the Lender having executed, delivered, become a party to, performed its obligations under, received payments under, received or perfected a security interest under or enforced this Agreement or that are described in clause (b) of the definition of Other Taxes).

"Other Taxes" means (a) all present or future stamp, court or documentary, intangible, recording, filing or similar Taxes that arise from any payment made under, from the execution, delivery, performance, enforcement or registration of, from the receipt or perfection of a security interest under, or otherwise with respect to, this Agreement and (b) all increased taxes imposed on Lender as a result of the classification of Lender as a corporation for federal and/or state and local income tax purposes.

"Parent Pledge and Security Agreement" means that certain Pledge and Security Agreement, dated as of the date hereof, made by Seale Moorer in favor of the Lender.

"Patent Enforcement Proceeds" means any and all monies received from patent enforcement actions relating to Intellectual Property owned by Nomadix, Inc. net of approved legal fees and approved expenses relating to such enforcement actions and shall include revenue due from any such successful patent enforcement actions that have been pursued at any time for which funds have not yet been received and shall include, but not be limited to, (i) the current cable company royalty obligations owed or to be owed to Nomadix, Inc. and (ii) the current license dispute pending in California federal court.

"PBGC" means the Pension Benefit Guaranty Corporation.

"Permitted Commercial Debt" means the incurrence of up to $3,000,000 of Indebtedness from a commercial bank by an Affiliate or a Subsidiary of the Borrower, which Indebtedness shall, to the satisfaction of the Lender, be structurally subordinated to the Obligations.

"Permitted Repayments" means (a) payment of Indebtedness permitted under Section 5.17 and (b) repayment of Indebtedness solely through the issuance of membership units of Borrower to the holder of such Indebtedness in satisfaction of such Indebtedness.

"Person" means any individual, partnership, corporation, limited liability company, association, trust, unincorporated organization or any other entity or organization, including any governmental authority.

"Plan" means any "employee benefit plan" (other than a Multiemployer Plan) within the meaning of Section 3(3) of ERISA that is maintained or is contributed to by the Borrower or any ERISA

Affiliate and is subject to Title IV of ERISA or the minimum funding standards under Section 412 of the Code or Section 302 of ERISA.

"Projections" means projections in substantially the form of Exhibit C, with such changes thereto as may be reasonably agreed by the Lender and the Borrower from time to time, duly certified by an officer of the Borrower and delivered to the Lender appropriately completed.

"Related Parties" means, with respect to any Person, such Person's Affiliates and the respective directors, officers, employees, agents and advisors of such Person and such Person's Affiliates.

"Reportable Event" means any of the events set forth in Section 4043(c) of ERISA, other than events for which the 30-day notice period has been waived.

"Required Lenders" at any time, the holders of more than 50% of the sum of the aggregate amount of the Term Loan then outstanding.

"Sanctioned Country" means, at any time, a country or territory which is the subject or target of any Sanctions.

"Sanctioned Person" means, at any time, (a) any Person listed in any Sanctions-related list of designated Persons maintained by the Office of Foreign Assets Control of the U.S. Department of the Treasury, the U.S. Department of State, the or by the United Nations Security Council, the European Union or any EU member state, (b) any Person operating, organized or resident in a Sanctioned Country or (c) any Person controlled by any such Person.

"Sanctions" means economic or financial sanctions or trade embargoes imposed, administered or enforced from time to time by (a) the U.S. government, including those administered by the Office of Foreign Assets Control of the U.S. Department of the Treasury or the U.S. Department of State, or (b) the United Nations Security Council, the European Union or Her Majesty's Treasury of the United Kingdom.

"Secured Parties" means the holders from time to time of the Obligations.

"Solvent" and "Solvency" mean, with respect to any Person on any date of determination, that on such date (a) the fair value of the property of such Person is greater than the total amount of liabilities, including contingent liabilities, of such Person, (b) the present fair salable value of the assets of such Person is not less than the amount that will be required to pay the probable liability of such Person on its debts as they become absolute and matured, (c) such Person does not intend to, and does not believe that it will, incur debts or liabilities beyond such Person's ability to pay such debts and liabilities as they mature, (d) such Person is not engaged in business or a transaction, and is not about to engage in business or a transaction, for which such Person's property would constitute an unreasonably small capital, and (e) such Person is able to pay its debts and liabilities, contingent obligations and other commitments as they mature in the ordinary course of business. The amount of contingent liabilities at any time shall be computed as the amount that, in light of all the facts and circumstances existing at such time, represents the amount that can reasonably be expected to become an actual or matured liability.

"Springing Guaranty" means that certain Springing Guaranty, dated as of the date hereof, by Seale Moorer in favor of the Lender.

"SQN Loan Agreement" means that certain Loan Agreement, dated as of June 30, 2015, by SQN Capital Management (UK) Limited or its Affiliates.

"SQN Insurance Policy" means that certain Insurance Policy, issued in conjunction with the SQN Loan Agreement.

"ST Holdings" means ST Holdings LLC, a Florida limited liability company.

"ST Holdings Pledge and Security Agreement" means that certain Pledge and Security Agreement, dated as of the date hereof, by ST Holdings in favor of the Lender.

"Subsidiary" means, as to any Person, a corporation, partnership, limited liability company or other entity of which shares of stock or other ownership interests having ordinary voting power (other than stock or such other ownership interests having such power only by reason of the happening of a contingency) to elect a majority of the board of directors or other managers of such corporation, partnership, limited liability company or other entity are at the time owned, or the management of which is otherwise controlled, directly or indirectly though one or more intermediaries, or both, by such Person. Unless otherwise qualified, all references to a "Subsidiary" and "Subsidiaries" in this Agreement shall refer to a Subsidiary or Subsidiaries of the Borrower.

"Taxes" means all present or future taxes, levies, imposts, duties, deductions, withholdings (including backup withholding), assessments, fees or other charges imposed by any Governmental Authority, including any interest, additions to tax or penalties applicable thereto.

"Transactions" means the execution, delivery, and performance by the Borrower of the Credit Documents, the borrowing and repayment of the Term Loan, the guaranty of the Term Loan pursuant to the Springing Guaranty, the pledge, assignments or grant of the security interests in the Collateral pursuant to the Credit Documents, the payment of interest and fees thereunder and the use of the proceeds of the Loan.

"Unrestricted Cash and Cash Equivalents" means domestic cash and domestic Cash Equivalents of the Loan Parties which in each case is not subject to any restriction on the use thereof to repay the Obligations.

"U.S." means the United States of America.

"Warrants" means rights to acquire equity securities of an entity, the terms of which shall include information rights, tag-along rights, cashless exercise rights, preemptive rights, and registration rights, and which, subject to applicable law, shall be freely transferable by the holder.

SECTION 1.02. Terms Generally. The definitions of terms herein shall apply equally to the singular and plural forms of the terms defined. Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms. The words "include," "includes," and "including" shall be deemed to be followed by the phrase "without limitation." The word "will" shall be construed to have the same meaning and effect as the word "shall." Unless the context requires otherwise (a) any definition of or reference to any agreement, instrument or other document herein shall be construed as referring to such agreement, instrument or other document as from time to time amended, supplemented or otherwise modified (subject to any restrictions on such amendments, supplements or

modifications set forth herein), (b) any reference herein to any Person shall be construed to include such Person's successors and assigns, (c) the words "herein," "hereof," and "hereunder," and words of similar import, shall be construed to refer to this Agreement in its entirety and not to any particular provision hereof, (d) all references herein to Articles, Sections, and Schedules shall be construed to refer to Articles and Sections of, and Schedules to, this Agreement (e) the words "asset" and "property" shall be construed to have the same meaning and effect and to refer to any and all tangible and intangible assets and properties, including cash, securities, accounts and general intangibles and (f) references to sections of, or rules under, the Securities Act or the Exchange Act shall be deemed to include substitute, replacement or successor sections or rules adopted by the SEC from time to time.

SECTION 1.03. Specified Times and Dates; Determinations. All times specified in this Agreement shall be determined, unless stated specifically herein to the contrary, on the basis of the prevailing time in New York City. Unless stated specifically herein to the contrary, if any day or date specified in this Agreement for any notice, action or event is not a Business Day, then the due date for such notice, action or event shall be extended to the immediately succeeding Business Day; provided that interest shall accrue on any payments due by the Borrower which are extended by the operation of this Section 1.03. Any determination by the Lender hereunder shall, in the absence of manifest error, be conclusive and binding.

## ARTICLE II
## THE TERM LOAN

SECTION 2.01. Term Loan. Subject to the terms and conditions and relying upon the representations and warranties set forth herein, Lender hereby agrees to make a Term Loan to the Borrower on the Closing Date in the aggregate principal amount of $2,650,000. Once repaid, the Term Loan or any portion thereof may not be re-borrowed. **Payments of principal and interest on the Term Loan shall be made in accordance with the payment and loan amortization schedule attached as EXHIBIT A to this Agreement.**

SECTION 2.02. Repayment of Loan.

(a) Any principal of any Term Loan not previously paid shall be payable on the Final Maturity Date.

(b) Lender shall maintain in accordance with its usual practice an account or accounts evidencing the Indebtedness of the Borrower to such Lender resulting from the Term Loan made by such Lender, including the amounts of principal and interest payable and paid to such Lender from time to time hereunder.

(c) The Lender shall maintain accounts in which it shall record (i) the amount of the Term Loan and the Interest Period applicable thereto, (ii) the amount of any principal or interest due and payable or to become due and payable from the Borrower to Lender hereunder and (iii) the amount of any sum received by the Lender hereunder for the account of the Lenders and Lender's share thereof.

(d) The entries made in the accounts maintained pursuant to paragraph (c) of this Section 2.02 shall be conclusive of the existence and amounts of the obligations recorded therein absent manifest error; provided that the failure of any Lender or the Lender to maintain such accounts or any

error therein shall not in any manner affect the obligation of the Borrower to repay the Term Loan in accordance with the terms of this Agreement.

SECTION 2.03. Interest.

(e) Loan. The Term Loan shall bear interest on the unpaid principal amount thereof from the borrowing date thereof, and any past due interest amounts thereon, until payment in full thereof. Interest shall be payable in cash in arrears (i) monthly on each Interest Payment Date in respect of the Interest Period ending on such Interest Payment Date, (ii) on the date of each prepayment (on the principal amount prepaid) and (iii) on the Final Maturity Date.

(f) Interest Rate. The interest rate for the Term Loan shall be 9.5% per annum.

(g) Default Interest. After the occurrence and during the continuance of an Event of Default, to the extent permitted by applicable law, the Borrower shall pay on demand, on the principal amount of the outstanding Term Loan and any overdue interest, interest at a rate of 14% per annum.

(h) Maximum Interest Rate. Notwithstanding anything in any Credit Document to the contrary, in no event shall the interest charged under any Credit Document exceed the maximum rate of interest permitted under applicable law. Any interest payment which would cause the interest charged to exceed the maximum rate permitted shall instead be held by the Lender to the extent of such excess as additional Collateral hereunder and applied to future interest payments as and when such amount becomes due and payable hereunder.

(i) Calculations. Interest shall be calculated on the basis of a year of 360 days. In computing interest on the Loan (or interest on past due interest), the date of the making of the Loan shall be included and the date of payment of the Loan shall be excluded.

SECTION 2.04. Prepayment of Loan.

(a) Optional Prepayment. The Borrower shall have the right to prepay Term Loan at any time in whole or from time to time in part without penalty.

(b) Notices. Any prepayment pursuant to Section 2.04(a) may only be made on at least 10 days' (or such shorter period as shall be agreed to by the Lender) prior written notice to the Lender.

(c) Mandatory Prepayments.

(i) In the event the Borrower extends the Final Maturity Date pursuant to Section 2.07, then, the Borrower shall prepay Term Loan on the original Final Maturity Date and on the first (1st) day of each month thereafter, a principal amount equal to 1.5% of the principal amount of Term Loan outstanding on the original Final Maturity Date.

(ii) Upon receipt of any cash proceeds from the sale or other Disposition of a material portion of the Borrower's assets, the materiality of which shall be determined by the Lender in its sole reasonable discretion but which shall only include sales or other Dispositions in excess of $10 million, lines of business, or similar transactions (which for the avoidance of doubt shall include the grant of an exclusive license to use substantially all of the Borrower's

intellectual property (excluding any licensing of patents and assignments or transfer of servicing rights of less than 10% of the portfolio of ST Holdings measured on debt under management)).

(iii) If any Extraordinary Receipts are received by or paid to or for the account of any Loan Party from a material casualty or insurance claim which results in the realization by such Person of net cash proceeds in excess of $20,000,000, the Borrower shall apply an amount equal to 100% of such net cash proceeds as a mandatory prepayment of the Term Loan within five (5) Business Days after receipt thereof by such Loan Party; provided that, with respect to any proceeds of insurance, condemnation awards (or payments in lieu thereof) or indemnity payments, at the election of the Borrower (as notified by the Borrower to the Lender on or prior to, or within five (5) Business Days after, the date of receipt of such insurance proceeds, condemnation awards or indemnity payments), and so long as no Default or Event of Default shall have occurred and be continuing, such Loan Party may apply the cash proceeds within six (6) months after the receipt of such cash proceeds to replace or repair the equipment, fixed assets or real property in respect of which such cash proceeds were received (in which case no prepayment shall be required pursuant to this paragraph); provided further that (i) pending such application, such net cash proceeds shall be deposited and held in an account covered by a deposit account control agreement with the Lender and (ii) to the extent any such cash proceeds have not been so applied by the end of such six (6) month period, a prepayment of the Term Loan shall be required at such time in an amount equal to the amount of such cash proceeds that have not been so applied.

(iv) Upon the incurrence of any Indebtedness other than the Permitted Commercial Debt or the issuance of any securities constituting Indebtedness by the Borrower, ST Holdings or any of their respective Subsidiaries, the Borrower shall prepay the Term Loan in an amount equal to the net cash proceeds of such issuance or incurrence.

(v) Upon the occurrence of any material change or notice of change in applicable law or regulation promulgated by any Governmental Authority that prohibits or impairs the ability of the Borrower or ST Holdings to conduct its business or service its customers and which material change or notice of change could reasonably be expected to result in a Material Adverse Effect on the financial condition of the Borrower and ST Holdings taken as a whole, the Borrower shall be required to prepay the Term Loan in full.

(vi) Amounts to be applied in connection with prepayments made pursuant to Section 2.04(c)(i) through (v) shall be applied to the Term Loan pro rata in accordance with the outstanding principal amount of each thereof and to Term Loan in inverse order of maturity.

SECTION 2.05. Note. The Term Loan made by the Lenders to the Borrower shall be evidenced by the Note, duly executed by or on behalf of the Borrower, delivered and payable to Lender in an aggregate principal amount equal to the Term Loan plus interest added to the principal as provided under this Agreement. The Lender shall maintain its records to reflect the amount and date of the Term Loan and of each payment of principal and interest thereon.

SECTION 2.06. Taxes. (a) Any and all payments made by the Borrower hereunder shall be made free and clear of and without deduction for any Taxes to the extent attributable to the Loan or the Collateral, unless required by law. If any applicable law (as determined in the good faith discretion of the Lender) requires deduction or withholding of any Tax from any such payment made by the

Borrower, then the Borrower shall be entitled to make such deduction or withholding and shall timely pay the full amount deducted or withheld to the relevant Governmental Authority in accordance with applicable law and, if such Tax is an Indemnified Tax, then the sum payable by the Borrower shall be increased as necessary so that after such deduction or withholding has been made (including such deductions and withholdings applicable to additional sums payable under this Section 2.06) the Lender receives an amount equal to the sum it would have received had no such deduction or withholding been made.

(b) The Borrower shall pay to the relevant Governmental Authority in accordance with applicable law any Other Taxes.

(c) The Borrower hereby indemnifies the Lender for the full amount of any Indemnified Taxes paid by the Lender. Payment pursuant to this indemnification shall be made as soon as reasonably practicable upon written demand thereof. The obligations of the Borrower under this paragraph shall survive the termination of this Agreement.

SECTION 2.07. Extension of Term Loan.

(a) No later than 90 days prior to the original Final Maturity Date, the Borrower may request that the Lender extend the Final Maturity Date to a Business Day which is up to six (6) months after the original Final Maturity Date. The Lender acknowledge that the foregoing extension of the Final Maturity Date (the "Extension") shall be made by the election of the Borrower in its the sole and absolute discretion provided that, each of the conditions specified in Section 4.03 shall be satisfied.

(b) The Borrower shall pay to the Lender an extension fee equal to 4.00% of the aggregate principal amount of the Term Loan outstanding on the date the Extension becomes effective (the "Extension Fee"). The Extension Fee shall be paid on the date the Extension becomes effective.

SECTION 2.08. Payments Generally; Pro Rata Treatment; Sharing of Set-offs.

(a) The Borrower shall make each payment required to be made by it hereunder (whether of principal, interest, fees, or otherwise) prior to 12:00 noon, New York City time, on the date when due, in immediately available funds, without set-off or counterclaim. Any amounts received after such time on any date may, in the discretion of the Lender, be deemed to have been received on the next succeeding Business Day for purposes of calculating interest thereon. All such payments shall be made to the Lender at its offices at 49 W 23rd Street, 8th Floor, New York, New York, 10010. The Lender shall distribute any such payments received by it for the account of any other Person to the appropriate recipient promptly following receipt thereof. Unless otherwise specified herein, if any payment hereunder shall be due on a day that is not a Business Day, the date for payment shall be extended to the next succeeding Business Day, and, in the case of any payment accruing interest, interest thereon shall be payable for the period of such extension. All payments hereunder shall be made in Dollars.

(b) If at any time insufficient funds are received by and available to the Lender to pay fully all amounts of principal, interest and fees then due hereunder, such funds shall be applied towards payment of interest and fees then due hereunder, ratably among the parties entitled thereto in accordance with the amounts of interest and fees then due to such parties (or as otherwise determined by the Lender).

**ARTICLE III**
**REPRESENTATIONS AND WARRANTIES**

The Borrower represents and warrants to the Lender, for itself and for the benefit of Lender that:

SECTION 3.01. Organization; Powers; Authorization; Enforceability, Etc. (a) Each of the Borrower and its Subsidiaries is duly organized, validly existing, and is in good standing under the laws of the jurisdiction of its organization, is licensed or authorized and duly qualified to do business in and is in good standing in every jurisdiction where the failure to so qualify would reasonably be expected to have or cause a Material Adverse Effect, and has all powers and all governmental licenses, authorizations, consents and approvals required to carry on its business as now conducted except where the failure to obtain such licenses, authorizations, consents and approvals would not reasonably be expected to result in a Material Adverse Effect; (b) The execution, delivery and performance by the Loan Parties of this Agreement and each other Credit Document to which such Loan Party is a party have been duly authorized, and do not conflict with, and will not result in a violation of, or constitute or give rise to an event of default under (i) any of such Loan Parties' organizational documents, (ii) any agreement or other instrument which may be binding upon the such Loan Party, (iii) any law or governmental regulation or court decree or order applicable to such Loan Party or such Loan Parties' properties, except, in the case of (ii) and (iii), where such conflict, violation or event of default would not reasonably be expected to result in a Material Adverse Effect. The Transactions do not require any consent or approval of, registration or filing with, or any other action by, any Governmental Authority, other than as already been obtained. The Loan Parties have the power and authority to enter into this Agreement and each other Credit Document to which such Loan Party is a party and have the power and authority to grant collateral security for the Term Loan. The Loan Parties have the further power and authority to own and to hold all of such Loan Parties' assets and properties, and to carry on such Loan Parties' business as now conducted.

SECTION 3.02. Indebtedness. As of the date hereof, other than as set forth on Schedule II and Indebtedness under the Credit Documents, neither the Borrower nor its Subsidiaries have (i) any unsecured Indebtedness greater than $2,000,000 or (iii) any secured Indebtedness; provided that no Indebtedness permitted to be incurred hereunder shall include (i) Indebtedness owing to any Person other than commercial banks or lenders under similar terms and (ii) Indebtedness owing to merchant advance lenders or other lenders at an annual percentage rate greater than 25%.

SECTION 3.03. Liens. Except as set forth on Schedule III, the Borrower and its Subsidiaries own and have good title to all of their respective material properties and assets, including, but not limited to, their respective rights in respect of the Collateral, and other than Liens permitted under this Agreement, own such material properties and assets free and clear of all security interests, and have not executed any security documents or authorized the filing of any financing statements relating to such properties and assets. All of the material properties and assets of the Borrower and its Subsidiaries are titled in their respective name, except as otherwise required or permitted under any Credit Document or if the lack thereof would have no more than a de minimis adverse effect on such Loan Party.

SECTION 3.04. Litigation. Except as set forth on Schedule IV, as of the date hereof, there are no suits, investigations or proceedings pending, or to the knowledge of the Borrower, threatened

against the Borrower or any Subsidiary or against any of their respective properties or revenues, before any court or by any governmental agency, which has a reasonable possibility of an adverse determination and, if adversely determined, would reasonably be expected to have or cause a Material Adverse Effect.

SECTION 3.05. Tax Returns. Each of the Borrower and its Subsidiaries' federal and material state and local (including any applicable non-U.S. jurisdictions) tax returns and reports that, to the knowledge of such Loan Party, are or were required to be filed have been filed (or an extension has been timely and duly requested), and all material amounts of Taxes, assessments and other governmental charges shown as due thereon have been paid in full, except (a) those that are not yet delinquent and those presently being or to be contested in good faith and for which adequate reserves have been provided, and (b) to the extent that the failure to do so would not reasonably be expected to have a Material Adverse Effect.

SECTION 3.06. Lien Priority. The security interests in the Collateral granted to the Lender by the Loan Parties pursuant to the Credit Documents are valid and perfected. Except as permitted or disclosed under this Agreement, the Loan Parties have not entered into or granted any security agreements, or consented to the filing or attachment of any security interests on or affecting any of the Collateral, that would grant the holder thereof priority over the security interests granted under the Credit Documents and rights in and to such Collateral.

SECTION 3.07. Binding Effect. This Agreement and all other Credit Documents executed by the Loan Parties are binding upon such Loan Party and are legally enforceable against such Loan Party in accordance with their respective terms, except as enforceability may be limited by applicable bankruptcy, insolvency, or similar laws affecting the enforcement of creditors' rights generally or equitable principles relating to enforceability.

SECTION 3.08. Employee Benefit Plans and Labor Matters. (a) Neither the Borrower nor any Subsidiary or any of their respective ERISA Affiliates maintains, contributes to or has any obligation to contribute to any Plan. Further, neither the Borrower nor any Subsidiary are, nor are they acting on behalf of or with any assets of, any Plan, nor will they be during the term of any Credit Document.

(b) Except as, in the aggregate, could not reasonably be expected to have a Material Adverse effect: (i) there are no strikes or other labor disputes against the Borrower or any Subsidiary pending or, to the knowledge of the Borrower, threatened; (ii) hours worked by and payment made to employees of the Borrower and its Subsidiaries have not been in violation of the Fair Labor Standards Act or any other applicable law dealing with such matters; and (iii) all payments due from the Borrower or any Subsidiary on account of employee health and welfare insurance have been paid or accrued as a liability on the books of the relevant Loan Party.

SECTION 3.09. Investment Company. Neither the Borrower nor any Subsidiary is an "investment company", or a company "controlled" by an "investment company", within the meaning of the Investment Company Act of 1940, as amended.

SECTION 3.10. Subsidiaries. Except as disclosed to the Lender by the Borrower in writing from time to time after the Closing Date, (a) Schedule V-A sets forth the name and jurisdiction of incorporation of each Subsidiary and, as to each Subsidiary, the percentage of each class of stock owned by any Loan Party and (b) there are no outstanding subscriptions, options, warrants, calls, rights or other

agreements or commitments (other than the warrants or options granted or to be granted pursuant to the pending 2018 employee option plan, which plan shall not constitute more than 10% of the fully diluted Core Entity) of any nature relating to any stock of the Borrower or any Subsidiary, except as created by the Credit Documents or as otherwise disclosed on Schedule V-B.

SECTION 3.11. Information. All written information heretofore or contemporaneously herewith furnished by the Loan Parties or any Subsidiary of the Borrower to the Lender for the purposes of or in connection with this Agreement or any transaction contemplated hereby (other than with respect to projected financial and other forward-looking information) is true and accurate in all material respects on the date as of which such information is dated or certified; and none of such information is incomplete by omitting to state any material fact necessary to make such information not misleading in any material respect. With respect to projected financial and other forward-looking information (including the Projections), the Borrower represents only that such information was prepared in good faith based upon assumptions believed by the Borrower to be reasonable at the time prepared.

SECTION 3.12. [Reserved.]

SECTION 3.13. Fiscal Year. The fiscal year of the Borrower ends on December 31.

SECTION 3.14. Compliance with Applicable Laws. The Borrower and its Subsidiaries have complied with (and will comply with), in all material respects, all federal, state or local laws applicable to it except where the failure to so comply would not reasonably be expect to have a Material Adverse Effect. The Borrower and its Subsidiaries have filed all notices, reports, documents or other information required to be filed thereunder, except where the failure to file such notices, reports, documents or other information would not reasonably be expected to have a Material Adverse Effect.

SECTION 3.15. Material Adverse Effect. Except as disclosed in the schedules attached hereto, since December 31, 2016, there has been no development or event that has had or could reasonably be expected to have a Material Adverse Effect.

SECTION 3.16. No Default. No Default or Event of Default has occurred and is continuing.

SECTION 3.17. Intellectual Property. The Borrower and its Subsidiaries own, or are licensed to use, all Intellectual Property necessary for the conduct of its business as currently conducted. No material claim has been asserted and is pending by any Person challenging or questioning the use of any Intellectual Property, nor does the Borrower know of any valid basis for any such claim, except as set forth on Schedule XII. The use of Intellectual Property by the Borrower or any Subsidiary does not infringe on the rights of any Person in any material respect, except as set forth on Schedule XII.

SECTION 3.18. Anti-Corruption Laws and Sanctions. The Borrower and its Subsidiaries have implemented and maintain in effect policies and procedures designed to ensure compliance by such entity and its directors, officers, employees and agents with Anti-Corruption Laws and applicable Sanctions, and such entity, its officers and employees and to the knowledge of the Borrower, its directors and agents, are in compliance with Anti-Corruption Laws in all material respects and applicable Sanctions. Neither (a) any of the Borrower nor its Subsidiaries or any of its directors, officers or employees, nor (b) to the knowledge of the Borrower, any agent of any of the Borrower nor its Subsidiaries that will act in any capacity in connection with or benefit from the credit facility established

hereby, is a Sanctioned Person. No borrowing, use of proceeds or other transaction contemplated by the Transactions will violate Anti-Corruption Laws or applicable Sanctions.

SECTION 3.19. Transactions with Affiliates. Except as set forth on Schedule VII, there are no intercompany arrangements or agreements between the Borrower and its Subsidiaries.

SECTION 3.20. Environmental Compliance.

(a) The Borrower and its Subsidiaries are not subject to any Environmental Liability that would reasonably be expected to have a Material Adverse Effect.

(b) Except as would not reasonably be expected to have a Material Adverse Effect, (i) none of the properties currently, or to the knowledge of the Borrower, formerly owned or operated by, the Borrower or any Subsidiary is listed or, to the knowledge of the Borrower, proposed for listing on the NPL or on the SEMS, CERCLIS or any analogous foreign, state or local list, (ii) there are no and, to the knowledge of the Borrower, there never have been any underground or aboveground storage tanks or any surface impoundments, septic tanks, pits, sumps or lagoons in which Hazardous Materials are being or have been treated, stored or disposed on any property currently owned or operated by the Borrower or any Subsidiary or, to the knowledge of the Borrower, on any property formerly owned or operated by the Borrower or any Subsidiary, (iii) there is no asbestos or asbestos-containing material on any property currently owned or operated by the Borrower requiring investigation, remediation, mitigation, removal, or assessment, or other response, remedial or corrective action, pursuant to any Environmental Law and (iv) Hazardous Materials have not been released, discharged or disposed of on any property currently or, to the knowledge of the Borrower, formerly owned or operated by the Borrower or any Subsidiary, except for such releases, discharges and disposals that were in compliance with Environmental Laws.

(c) None of the real property owned by the Borrower or any Subsidiary contain any Hazardous Materials in amounts or in concentrations which constitute a violation of, or require remedial action under, Environmental Laws or otherwise could reasonably be expected to give rise to an Environmental Liability, except for any such violations, remedial actions and liabilities that would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

(d) Neither the Borrower nor any Subsidiary is undertaking, and has not completed, either individually or together with other potentially responsible parties, any investigation, remediation, mitigation, removal, assessment or remedial, response or corrective action relating to any actual or threatened release, discharge or disposal of Hazardous Materials at any site, location or operation, either voluntarily or pursuant to the order of any Governmental Authority or the requirements of any Environmental Law, except for any such investigations or assessments or remedial or responsive actions that, individually or in the aggregate, would not reasonably be expected to result in a Material Adverse Effect.

(e) All Hazardous Materials generated, used, treated, handled or stored at, or transported to or from, any property currently or, to the knowledge of the Borrower, formerly owned or operated by the Borrower or any Subsidiary have been disposed of in a manner not reasonably expected to result in liability to such entity that would, individually or in the aggregate, reasonably be expected to result in a Material Adverse Effect.

SECTION 3.21. Burdensome Agreements. Except as set forth on Schedule VI, no Subsidiary of the Borrower is party to any contractual obligation (other than this Agreement or any other Credit Document) that limits the ability of such Subsidiary to make distributions or dividends to the Borrower.

SECTION 3.22. Patents. Except as disclosed to the Lender by the Borrower in writing from time to time after the Closing Date, Schedule IX sets forth all patents owned by the Borrower or any Subsidiary, whether each patent is an Included Patent or Excluded Patent and if such patent is an Excluded Patent, the reason for such exclusion.

## ARTICLE IV
## CONDITIONS

SECTION 4.01. Closing Date. The obligation of the Lenders to make the Term Loan to the Borrower hereunder is subject to the satisfaction of the following conditions (any or all of which may be waived in accordance with Section 8.02(b)):

(a) The Lender shall have received executed counterparts of (i) this Agreement from each party hereto; (ii) the Springing Guaranty, (iii) the Borrower Pledge and Security Agreement; (iv) the Parent Pledge and Security Agreement; (v) the ST Holdings Pledge and Security Agreement, (vi) the Note.

(b) [Reserved.]

(c) [Reserved.]

(d) [Reserved.]

(e) [Reserved.]

(f) [Reserved.]

(g) The Lender shall have received the results of a recent Lien search with respect to Loan Party, and such search shall reveal no Liens on any of the assets of the Loan Parties except for Liens permitted by Section 5.16 or discharged on or prior to the Closing Date pursuant to documentation satisfactory to the Lender.

(h) The Lenders and the Lender shall have received all fees required to be paid, and all expenses for which invoices have been presented (including the reasonable fees and expenses of legal counsel), on or before the Closing Date. All such amounts will be paid with proceeds of the Initial Term Loan made on the Closing Date and will be reflected in the funding instructions given by the Borrower to the Lender on or before the Closing Date.

(i) Each document (including any Uniform Commercial Code financing statement) required any Collateral Document or under law or reasonably requested by the Lender to be filed, registered or recorded in order to create in favor of the Lender, for the benefit of the Lenders, a perfected Lien on the Collateral described therein, shall be in proper form for filing, registration or recordation.

(j) The Lender shall have received evidence that all insurance required to be maintained pursuant to the Credit Documents has been obtained and is in effect, together with certificates of insurance naming the Lender, on behalf of the Lenders, as an additional insured and lender loss payee, as the case may be, under all insurance policies maintained with respect to the assets and properties of the Loan Parties that constitute Collateral.

(k) [Reserved.]

(l) [Reserved.]

(m) [Reserved.]

(n) The Lender shall have received such other certificates, documents, instruments and agreements as the Lender or counsel to the Lender shall reasonably request.

SECTION 4.02. Conditions to Each Borrowing. The obligation of the Lender to make the Term Loan to the Borrower hereunder is subject to the satisfaction of the following conditions (any or all of which may be waived in accordance with Section 8.02(b)):

(a) The representations and warranties made by the Loan Parties herein and in the other Credit Documents are (i) with respect to representations and warranties that contain a materiality qualification, true and correct and (ii) with respect to representations and warranties that do not contain a materiality qualification, true and correct in all material respects on and as of the date of such borrowing, except to the extent that such representations and warranties specifically refer to an earlier date, in which case they shall be true and correct as of such earlier date.

(b) At the time of and immediately after giving effect to such borrowing, no Default or Event of Default shall have occurred and be continuing.

(c) The Lender shall have received such other certificates, opinions, documents, instruments and agreements as the Lender or counsel to the Lender shall reasonably request.

Each borrowing shall be deemed to constitute a representation and warranty by the Loan Parties that the conditions set forth in paragraphs (a) and (b) of this Section 4.02 have been satisfied on and as of the date thereof.

SECTION 4.03. Conditions to Extension of Final Maturity Date. The obligation of the Lenders to extend the Final Maturity Date hereunder pursuant to Section 2.07 is subject to the satisfaction of the following conditions (any or all of which may be waived in accordance with Section 8.02(b)):

(a) The conditions set forth in Section 4.02 shall be satisfied as of the date of the extension agreement.

(b) An extension agreement between the Borrower and the Lender, in form and substance reasonably satisfactory to the Lender.

(c) The Lender shall have received in form and substance reasonably satisfactory to the Lender an Officer's Certificate from Loan Party (other than any natural person), dated the Closing

Date, certifying (i) as to its certificate of incorporation or certificate of formation (as applicable), bylaws or operating agreement (as applicable), long form good standing certificate from its jurisdiction of organization, resolutions authorizing the Transactions and incumbency of officers signing the Credit Documents and (ii) that each of the representations and warranties of the Borrower set forth in the Credit Documents are true and correct.

(d) The Lender shall have received in form and substance reasonably satisfactory to the Lender opinions of counsel to the Loan Parties (other than any natural person) regarding (i) certain corporate and perfection matters relating to the Credit Documents, (ii) the Investment Company Act status of the Borrower, and (iii) such other matters as the Lender may reasonably request.

(e) The Lender shall have received the results of a recent Lien search with respect to Loan Party, and such search shall reveal no Liens on any of the assets of the Loan Parties except for Liens permitted by Section 5.16 or discharged on or prior to the date of the extension agreement pursuant to documentation satisfactory to the Lender.

(f) The Lenders and the Lender shall have received all fees required to be paid.

(g) The Lender shall have received such other certificates, documents, instruments and agreements as the Lender or counsel to the Lender shall reasonably request.

**ARTICLE V**
**COVENANTS**

SECTION 5.01. The Borrower agrees that so long as any Term Loan Commitment remains in effect or any Term Loan or other amount is owning to the Lender, the Borrower shall and shall cause each of its Subsidiaries to do the following:

(a) Financial Statements and Other Information. The Borrower shall deliver to the Lender:

(i) as soon as available, but in any event for fiscal year 2017 of each Material Subsidiary within 180 days after the end of such fiscal year, and for fiscal year 2018 of each Material Subsidiary and thereafter, within 120 days after the end of each such fiscal year, a copy of the audited balance sheet of such Material Subsidiary as at the end of such year and the related audited consolidated statements of income and of cash flows for such year, setting forth in each case in comparative form the figures for the previous year, reported on without a "going concern" or like qualification or exception, or qualification arising out of the scope of the audit, by independent certified public accountants of regionally recognized standing;

(ii) as soon as available, but in any event within 45 days after the end of each month occurring during each fiscal year of each Material Subsidiary, the unaudited consolidated balance sheet of each Material Subsidiary as at the end of such month and the related unaudited consolidated statements of income and of cash flows for such month and the portion of the fiscal year through the end of such month, setting forth in each case comparative form the figures of the previous year, certified by an officer of the Borrower as being fairly stated in all material respects (subject to normal year-end audit adjustments);

(iii) Concurrently with any delivery of financial statements under clause (i) or (ii) above, a Compliance Certificate signed by the chief executive officer or the chief financial officer of the Borrower, (x) certifying as to whether a Default has occurred and, if a Default has occurred, specifying details thereof and any action taken or proposed to be taken and (y) setting forth reasonably detailed calculations demonstrating compliance with Section 5.29;

(iv) On or prior to the beginning of each fiscal year, beginning with the 2018 fiscal year, an updated copy of the Projections through at least December 31 of such fiscal year; and

(v) [reserved];

(vi) promptly, such additional information as may be reasonably requested by the Lender from time to time; and

(vii) All written information that will be furnished by the Loan Parties to the Lender for the purposes of or in connection with this Agreement or any transaction contemplated hereby (other than with respect to projected financial and other forward-looking information) will be true and accurate in all material respects on the date as of which such information is dated or certified; and none of such information will be incomplete by omitting to state any material fact necessary to make such information not misleading in any material respect. With respect to projected financial and other forward-looking information (including the Projections), the Borrower represents only that such information was prepared in good faith based upon assumptions believed by the Borrower to be reasonable at the time prepared.

(b) Public/Non-Public Information or Confidential Information. The Borrower shall designate and mark, or cause to be designated and marked, any reports or notices delivered under this Section 5.01 which in its good faith judgment contain Material Non-Public Information or Confidential Information; provided that the determination as to whether any Person has received Material Non-Public Information shall be the responsibility of such Person and, except to the extent provided in Section 7.12(b) or otherwise in the Credit Documents, the Borrower shall not be obligated under the Credit Documents to make public any information required to be delivered by it under this Agreement.

SECTION 5.02. Notices. Within three Business Days following the Borrower's knowledge thereof, the Borrower shall notify the Lender:

(a) of the occurrence of any Default or Event of Default;

(b) of any matter that has resulted or would reasonably be expected to result in a Material Adverse Effect;

(c) of the institution of any material litigation not previously disclosed by the Borrower to the Lender, or any material development in any material litigation in each case that is reasonably likely to be adversely determined and would, if adversely determined, be reasonably expected to have a Material Adverse Effect on the Collateral or the security interests granted to the Lender thereon, or a Material Adverse Effect, or that seeks to enjoin or otherwise prevent the consummation of, or to recover any damages or obtain relief as a result of, the transactions contemplated herein;

(d) of the occurrence of any ERISA Event, where there is any potential material liability to the Borrower as a result thereof; and

(e) of the occurrence of an event of default or equivalent term under the Underlying Financing Documents.

Each notice pursuant to this Section shall be accompanied by a statement of an officer of the Borrower setting forth details of the occurrence referred to therein and stating what action the Borrower has taken and proposes to take with respect thereto.

SECTION 5.03. Taxes and Claims. The Borrower shall, and shall cause its Subsidiaries to pay, prior to delinquency, all material amounts of Taxes imposed upon it or any of its properties or assets and all lawful claims for sums that have become due and payable and that by law have or may become a Lien upon any of its properties or assets, except in the case of any such Taxes or lawful claim (a) it is being contested in good faith and for which adequate reserves have been provided, and (b) failure to pay or discharge the same would not reasonably be expected to result in a Material Adverse Effect.

SECTION 5.04. Corporate Existence, Etc. The Borrower shall, and shall cause each of the Loan Parties to (a) preserve, renew and maintain its organizational existence, (b) take all reasonable action to maintain all rights, privileges (including its good standing, if such concept is applicable in its jurisdiction of organization), permits, licenses and franchises necessary or desirable in the normal conduct of its business, except to the extent that failure to do so would not reasonably be expected to have a Material Adverse Effect or as otherwise permitted hereunder, and (c) preserve or renew all of its preservable or renewable, as applicable, United States registered patents, trademarks, trade names and service marks to the extent permitted by applicable laws of the United States, except to the extent the non-preservation of which would not reasonably be expected to have a Material Adverse Effect or as otherwise permitted hereunder. The Borrower shall assert all defenses to payment, exercise all applicable remedies and seek all available subrogation or other recoveries in respect of its insured obligations to the same extent as if it had not entered into this Agreement.

SECTION 5.05. Maintenance of Properties. The Borrower shall, and shall cause its Subsidiaries to keep all material property necessary to the proper conduct of the business of the Borrower and its Subsidiaries in good working order and condition (ordinary wear and tear and loss or damage by casualty or condemnation excepted) with such exceptions as would not reasonably be expected to have a Material Adverse Effect.

SECTION 5.06. Maintenance of Insurance. The Borrower shall, and shall cause its Material Subsidiaries to maintain with financially sound and reputable insurance companies (in the reasonable judgment of the Lender) with respect to its properties and business against loss or damage of the kinds customarily insured against by Persons engaged in the same or similar business, of such types and in such amounts as are customarily carried under similar circumstances by such other Persons and other such insurance as the Lender may reasonably request, and will furnish to the Lender upon reasonable written request, information presented in reasonable detail as to the insurance so carried.

SECTION 5.07. Compliance with Laws. The Borrower shall, and shall cause its Subsidiaries to comply with the requirements of all applicable laws and all orders, writs, injunctions and

decrees applicable to it or to its business or property, except if the failure to comply therewith would not reasonably be expected to have a Material Adverse Effect.

SECTION 5.08. Books and Records. The Borrower shall, and shall cause its Subsidiaries to keep proper books of records and account in which full, true and correct entries in conformity with GAAP and all requirements of law shall be made of all dealings and transactions in relation to its business and activities.

SECTION 5.09. Inspection Rights. Upon reasonable notice from the Lender, the Borrower will permit the Lender (and such Persons acting for the Lender as the Lender may reasonably designate) during normal business hours at the Borrower's sole expense for two inspections in any consecutive period of twelve months unless an Event of Default is continuing, to visit and inspect any of the properties of the Borrower to examine all of their books and records to make copies and extracts therefrom, including any information about the Collateral (subject to reasonable confidentiality restrictions), and to discuss their respective affairs, finances and accounts with their respective officers and independent public accountants (and by this provision the Borrower authorizes such accountants to discuss with the Lender (and such Persons acting for the Lender as the Lender may reasonably designate) the affairs, finances and accounts of the Borrower), all as often, and to such extent, as may be reasonably requested. The chief financial officer of the Borrower and/or his or her designee shall be afforded the opportunity to be present at any meeting of the Lender and such accountants.

SECTION 5.10. Use of Proceeds. The Borrower and its Subsidiaries shall use the proceeds of the Term Loan to pay certain indebtedness and other ordinary course business purposes, and for working capital.

SECTION 5.11. Margin Stock. The Loan Parties shall not (a) engage in the business of extending credit for the purpose of purchasing or carrying margin stock in violation of Regulations T, U or X of the Board of Governors of the Federal Reserve System or (b) use any proceeds of the Loan for a purpose which violates Regulations T, U or X of the Board of Governors of the Federal Reserve System.

SECTION 5.12. [Reserved.]

SECTION 5.13. Compliance with Environmental Laws. Except, in each case, to the extent that the failure to do so would not reasonably be expected to have a Material Adverse Effect, the Borrower shall and shall cause its Subsidiaries to (a) comply, and make all reasonable efforts to cause all lessees and other Persons operating or occupying its properties to comply, in all material respects, with all applicable Environmental Laws and Environmental Permits; obtain and renew all Environmental Permits necessary for its operations and properties and (b) to the extent required under Environmental Laws, conduct any investigation, mitigation, study, sampling and testing, and undertake any cleanup, removal or remedial, corrective or other action necessary to respond to and remove all Hazardous Materials from any of its properties, in accordance with the requirements of all Environmental Laws, unless liability for such actions is being contested in good faith.

SECTION 5.14. Compliance with Laws; Policies and Procedures. Without limiting any of the other covenants in this Article 5, the Borrower shall and shall cause its Subsidiaries to (i) conduct its business, and otherwise be, in compliance with all applicable laws, regulations, ordinances and orders of any governmental or judicial authorities if the failure to comply thereunder would

reasonably be expected to have a Material Adverse Effect; provided, however, that this Section 5.15 shall not require the Borrower to comply with any such law, regulation, ordinance or order if it shall be contesting such law, regulation, ordinance or order in good faith by appropriate proceedings and reserves in conformity with GAAP, (ii) comply with all obligations it might have under Anti-Corruption Laws and (iii) comply with all applicable Sanctions imposed on it. The Borrower shall and shall cause its Subsidiaries to maintain in effect and enforce policies and procedures intended to ensure compliance by the Borrower and its Subsidiaries and their respective officers, directors, employees and agents with Anti-Corruption Laws and Sanctions.

SECTION 5.15. Liens. The Borrower shall not, and shall not permit any of its Material Subsidiaries to create, incur, assume or suffer to exist any Lien of any kind upon any of its property, assets or revenues, whether now owned or hereafter acquired, other than (a) Liens arising by operation of law, (b) Liens under any Credit Document, (c) Liens existing on the Closing Date and listed on Schedule III, (d) ordinary course Liens in connection with any office space lease and office equipment (which, for the avoidance of doubt, shall not include any operating leases for telecom equipment); (e) Liens for Taxes not yet due and payable or being contested in good faith by appropriate procedures; (f) mechanics, carriers', workmen's, repairmen's or other like liens arising or incurred in the ordinary course of business; (g) easements, rights of way, zoning ordinances and other similar encumbrances affecting leased real property that do not adversely affect the operation of the business at the real property; and (h) Liens arising under original purchase price conditional sales contracts and equipment leases with third parties entered into in the ordinary course of business.

SECTION 5.16. Investments. The Borrower shall not, and shall not permit any of its Subsidiaries to make or hold any Investments, other than (a) Investments existing on the Closing Date and listed on Schedule VIII, (b) Investments in Cash Equivalents, (c) intercompany loans permitted under Section 5.10 and (d) ordinary course Investments in accordance with the Projections.

SECTION 5.17. Indebtedness. The Borrower shall not, and shall not permit any of its Subsidiaries to create, incur, assume or suffer to exist any Indebtedness (including capital lease obligations), other than (a) Indebtedness under the Credit Documents, (b) Indebtedness existing on the Closing Date and listed on Schedule II, (c) the Permitted Commercial Debt, (d) any Indebtedness incurred in the ordinary course under EIBV's equipment financing program, (e) any intercompany Indebtedness between the Borrower and its Subsidiaries or between Subsidiaries and (f) renewals, extensions or refinancing of Indebtedness permitted under this Section 5.17 (without increasing, or shortening the maturity of, the principal amount thereof).

SECTION 5.18. [Reserved].

SECTION 5.19. [Reserved].

SECTION 5.20. Dividends. The Borrower shall not declare or pay any dividend or make any other similar payment or distribution on account of its equity interests or to the direct or indirect holders of its equity interests in their capacity as such.

SECTION 5.21. Change in Nature of Business. The Borrower shall not, and shall not permit any of its Material Subsidiaries to engage in any material line of business substantially different from those lines of business conducted by the Borrower and its Subsidiaries on the date hereof or any

business reasonably related, complementary, synergistic or ancillary thereto or reasonable extensions thereof.

SECTION 5.22. Transactions with Affiliates. The Borrower shall not, and shall not permit any of its Subsidiaries to enter any transaction of any kind with any Affiliate of the Borrower other than transactions in the ordinary course of business and as contemplated by this Agreement.

SECTION 5.23. Burdensome Agreements. The Borrower shall not, and shall not permit any of its Subsidiaries to enter into or permit to exist any contractual obligation (other than this Agreement or any other Credit Document) that prohibits any Subsidiary from making distributions or dividends to the Borrower.

SECTION 5.24. Accounting Changes. The Borrower shall not make any change in the fiscal year of the Borrower.

SECTION 5.25. Prepayments, Etc. of Indebtedness; Amendments. Borrower shall not, and shall not permit any of its Subsidiaries to amend, modify or change any term or condition of any documentation with respect to any Indebtedness in any manner that, taken as a whole, materially adversely impacts the ability of the Borrower to repay the principal and interest of the Term Loan.

SECTION 5.26. Amendment of Subsidiary Organization Documents. The Borrower shall not permit any of its Subsidiaries to amend, modify, restate or supplement any of its organization documents, in each case, if such amendment, modification, restatement or supplement would reasonably be expected to adversely impact the ability of the Borrower to repay the principal and interest of the Term Loan; provided that nothing in this Section 5.26 shall be deemed to restrict any amendment, modification, restatement or supplement required pursuant to any requirement of law or Governmental Authority.

SECTION 5.27. Conduct of Business. The Borrower shall not conduct, transact or otherwise engage in any business, operations or activities other than ordinary course business activities and operations and other than as set forth below:

(a) to own, hold and collect all or any portion of the Collateral;

(b) to perform its obligations under prior documents, instruments or agreements;

(c) to engage in any lawful act or activity and to exercise any powers permitted to limited liability companies organized under the laws of the State of Delaware that are reasonably related or incidental to and necessary, convenient or advisable for the accomplishment of the above-mentioned purposes (including the establishment of bank accounts and referral, management, servicing and administration agreements);

(d) to issue limited liability company interests as provided for in the Operating Agreement; and

(e) to the extent not otherwise prohibited hereunder, to take any and all other actions necessary to maintain the existence of the Borrower as a limited liability company in good standing under the laws of the State of Delaware and/or to qualify the Borrower to do business as a foreign limited liability company in any other state in which such qualification is required.

SECTION 5.28. Leases. The Borrower shall not, and shall not permit any of its Subsidiaries to enter into or be party to any leases other than (a) capital lease obligations permitted pursuant to Section 5.17 and (b) ordinary course leases for office space and office equipment.

SECTION 5.29. Limitation on Modifications. The Borrower shall not amend, modify, waive or otherwise change any provision of the Operating Agreement without the prior written consent of the Lender.

## ARTICLE VI
## EVENTS OF DEFAULT

SECTION 6.01. If any of the following events (each an "Event of Default") shall occur:

(a) Failure of the Borrower to pay any principal of the Term Loan when and as the same shall become due and payable, whether at the due date thereof or at a date fixed for prepayment thereof or otherwise;

(b) Failure of the Borrower to pay any interest on the Term Loan or any fee or any other amount (other than an amount referred to in clause (a) above) payable under this Agreement or any other Credit Document, when and as the same shall become due and payable, and such failure shall continue unremedied for a period of three (3) Business Days;

(c) any representation or warranty made or deemed made herein or in any other Credit Document, or which is contained in any certificate, document or financial or other statement furnished at any time under or in connection herewith shall prove to have been incorrect, false or misleading on or as of the date made or deemed made which failure has a Material Adverse Effect;

(d) failure to comply with any covenant or agreement provided for in Sections 5.02, 5.04, 5.10 and 5.15 through 5.29;

(e) failure to comply with any covenant, condition or agreement contained in this Agreement (other than those specified in clause (a) through (d) of this Section 6.01) or any other Credit Document, and such failure shall continue unremedied for a period of thirty (30) days (or five (5) days in the case of covenants, conditions or agreements set forth in Sections 5.01 and 5.14) after the earlier to occur of (i) notice thereof from the Lender to the Borrower (which notice will be given at the request of any Lender) and (ii) an officer of the Borrower or the applicable Loan Party otherwise become aware of such Default;

(f) an involuntary proceeding shall be commenced or an involuntary petition shall be filed seeking (i) liquidation, reorganization or other relief in respect of any Loan Party or any Material Subsidiary of the Borrower, or its debts, or of a substantial part of its assets, under any Federal, state or foreign bankruptcy, insolvency, receivership or similar law now or hereafter in effect or (ii) the appointment of a receiver, trustee, custodian, sequestrator, conservator or similar official for any Loan Party or any Material Subsidiary of the Borrower, or for a substantial part of its assets, and, in any such

case, such proceeding or petition shall continue undismissed for sixty (60) days or an order or decree approving or ordering any of the foregoing shall be entered;

(g) any Loan Party or any Material Subsidiary of the Borrower shall (i) voluntarily commence any proceeding or file any petition seeking liquidation, reorganization or other relief under any Federal, state or foreign bankruptcy, insolvency, receivership or similar law now or hereafter in effect, (ii) consent to the institution of, or fail to contest in a timely and appropriate manner, any proceeding or petition described in clause (f) of this Section 6.01, (iii) apply for or consent to the appointment of a receiver, trustee, custodian, sequestrator, conservator or similar official for any Loan Party or any Material Subsidiary of the Borrower or for a substantial part of its assets, (iv) file an answer admitting the material allegations of a petition filed against it in any such proceeding, (v) make a general assignment for the benefit of creditors or (vi) take any action for the purpose of effecting any of the foregoing;

(h) one or more judgments or decrees shall be entered against the Borrower or any of its Material Subsidiaries involving in the aggregate a liability (to the extent not covered by insurance) of $500,000 or more (or the equivalent of such amount in any currency other than Dollars, such equivalent amount thereof in the applicable currency to be determined by the Lender in its reasonable discretion) and all such judgments or decrees shall not have been paid and satisfied, vacated, discharged, stayed or bonded pending appeal within 60 days from the entry thereof;

(i) (i) any Collateral Agreement shall for any reason cease to create a valid and perfected first-priority Lien on any portion of the Collateral (other than in accordance with the terms of this Agreement or the terms of the Security Agreement) or (ii) the Borrower, any rehabilitator, liquidator, conservator or other receiver of the Borrower that any Lien created under the Security Agreement is invalid or unenforceable;

(j) any "Event of Default" shall occur and continue beyond the applicable cure period, if any, under any Underlying Financing Document or any other Indebtedness of any Loan Party;

(k) any material provision of any Credit Document, at any time after its execution and delivery and for any reason other than as expressly permitted hereunder or thereunder ceases to be in full force and effect; or the Borrower denies in writing the validity or enforceability of any provision of any Credit Document or the validity or priority of a Lien as required by the Security Agreement, or the Borrower denies in writing that it has any or further liability or obligation under any Credit Document; or

(l) an ERISA Event occurs which results or would reasonably be expected to result in liability of the Borrower or any Subsidiary in an aggregate amount (determined as of the date of occurrence of such ERISA Event) which would reasonably be expected to result in a Material Adverse Effect or (ii) the Borrower, any Subsidiary, or any ERISA Affiliate fails to pay when due, after the expiration of any applicable grace period, any installment payment with respect to its withdrawal liability under Section 4201 of ERISA under any Multiemployer Plan which has resulted or would reasonably be expected to result in liability of the Borrower or any Subsidiary in an aggregate amount which would reasonably be expected to result in a Material Adverse Effect; then, and in every such event (other than an event with respect to the Borrower or any Subsidiary described in Section 6.01(g)), and at any time thereafter during the continuance of such event, the Lender may by notice to the Borrower, take any or all of the following actions, at the same or different times: (i) terminate the Term Loan Commitments, and thereupon all Term Loan Commitments shall terminate immediately, and (ii) declare the Term Loan then outstanding to be due and payable in whole (or in part, in which case any principal not so declared to be

due and payable may thereafter be declared to be due and payable), and thereupon the principal of the Term Loan so declared to be due and payable, together with accrued interest thereon and all fees and other Obligations of the Borrower accrued hereunder, shall become due and payable immediately, without presentment, demand, protest or other notice of any kind, all of which are hereby waived by the Borrower and its Subsidiaries; and in case of any event with respect to the Borrower or any Subsidiary described in Section 6.01(g), all Term Loan Commitments shall automatically terminate and the principal of the term Loan then outstanding, together with accrued interest and all fees and other Obligations of the Borrower accrued hereunder, shall automatically become due and payable, without presentment, demand, protest or other notice of any kind, all of which are hereby waived by the Borrower and its Subsidiaries.

SECTION 6.02. Application of Money Collected. Any proceeds received by the Lender in respect of any sale of, collection from or other realization upon all or any part of the Collateral pursuant to the exercise by the Lender of its rights and remedies provided under the Credit Documents or at law or equity, shall be applied by the Lender in the following order:

First, to the payment of all reasonable costs and expenses incurred by the Lender in connection with such sale, collection or other realization;

Second, to the payment of that portion of the Obligations constituting fees, indemnities, expenses and other amounts (including fees, charges and disbursements of counsel to the Lender) payable to the Lender in its capacity as such;

Third, to the payment of that portion of the Obligations constituting fees, indemnities and other amounts payable to the Lenders, ratably among them in proportion to the respective amounts described in this clause Third payable to them;

Fourth, to the payment of interest on the Term Loan and any other Obligations;

Fifth, to the payment of that portion of the Obligations constituting unpaid principal of the Term Loan (which payment shall be applied to the principal repayment installments of the Term Loan (including the final principal repayment installation of such Term Loan due on the Final Maturity Date), in inverse order of maturity); and

Last, the balance, if any, after all the Obligations have been indefeasibly paid in full, to the Borrower or as otherwise required by law.

## ARTICLE VII
## THE LENDER

SECTION 7.01. Appointment. To the extent that there are multiple lenders (the" Lenders"), the Lender is hereby irrevocably appointed as their agent and authorize the Lender to take such actions on its behalf, including execution of the other Credit Documents to which Lender is a party, and to exercise such powers as are delegated to Lender, respectively, by the terms of the Credit Documents, together with such actions and powers as are reasonably incidental thereto. In addition, to the extent required under the laws of any jurisdiction other than the U.S., each of the Lenders hereby grants to the Lender any required powers of attorney to execute any Collateral Document governed by the laws of such jurisdiction on such Lender's behalf. The provisions of this Article are solely for the benefit of the Lender and the Lenders, and the Loan Parties shall not have rights as a third party beneficiary of any of such

provisions. It is understood and agreed that the use of the term "agent" as used herein or in any other Credit Documents (or any similar term) with reference to the Lender is not intended to connote any fiduciary or other implied (or express) obligations arising under agency doctrine of any applicable law. Instead, such term is used as a matter of market custom, and is intended to create or reflect only an administrative relationship between independent contracting parties.

SECTION 7.02. Rights. To the extent applicable, each bank serving as Lender hereunder shall have the same rights and powers in its capacity as a Lender as any other Lender and may exercise the same as though it were not Lender, and such bank and its Affiliates may accept deposits from, lend money to and generally engage in any kind of business with the Loan Parties or any Subsidiary of a Loan Party or other Affiliate thereof as if it were not Lender hereunder.

SECTION 7.03. Duties and Obligations. Lender shall not have any duties or obligations except those expressly set forth in the Credit Documents. Without limiting the generality of the foregoing, (a) Lender shall not be subject to any fiduciary or other implied duties, regardless of whether a Default or Event of Default has occurred and is continuing, (b) Lender shall not have any duty to take any discretionary action or exercise any discretionary powers, except discretionary rights and powers expressly contemplated by the Credit Documents that Lender is required to exercise in writing as directed by the Required Lenders (or such other number or percentage of the Lenders as shall be necessary under the circumstances as provided in Section 8.02), and (c) except as expressly set forth in the Credit Documents, Lender shall not have any duty to disclose, and shall not be liable for the failure to disclose, any information relating to any Loan Party or any of its Subsidiaries that is communicated to or obtained by the bank serving as Lender or any of its Affiliates in any capacity. Lender shall not be liable for any action taken or not taken by it with the consent or at the request of the Required Lenders (or such other number or percentage of the Lenders as shall be necessary under the circumstances as provided in Section 8.02) or in the absence of its own gross negligence or willful misconduct as determined by a final nonappealable judgment of a court of competent jurisdiction. Lender shall be deemed not to have knowledge of any Default or Event of Default unless and until written notice thereof is given to Lender by a Borrower or a Lender, and the Lender shall not be responsible for or have any duty to ascertain or inquire into (i) any statement, warranty or representation made in or in connection with any Credit Document, (ii) the contents of any certificate, report or other document delivered hereunder or thereunder or in connection with any Credit Document, (iii) the performance or observance of any of the covenants, agreements or other terms or conditions set forth in any Credit Document, (iv) the validity, enforceability, effectiveness or genuineness of any Credit Document or any other agreement, instrument or document, (v) the creation, perfection or priority of Liens on the Collateral or the existence of the Collateral, or (vi) the satisfaction of any condition set forth in Article IV or elsewhere in any Credit Document, other than to confirm receipt of items expressly required to be delivered to Lender.

SECTION 7.04. Reliance. Lender shall be entitled to rely upon, and shall not incur any liability for relying upon, any notice, request, certificate, consent, statement, instrument, document or other writing believed by it to be genuine and to have been signed or sent by the proper Person. Lender also may rely upon any statement made to it orally or by telephone and believed by it to be made by the proper Person, and shall not incur any liability for relying thereon. Lender may consult with legal counsel (who may be counsel for the Borrowers), independent accountants and other experts selected by it, and shall not be liable for any action taken or not taken by it in accordance with the advice of any such counsel, accountants or experts.

SECTION 7.05. Actions through Sub-Agents. Lender may perform any and all its duties and exercise its rights and powers by or through any one or more sub-agents appointed by Lender. Lender and any such sub-agent may perform any and all its duties and exercise its rights and powers through their respective Related Parties. The exculpatory provisions of the preceding paragraphs shall apply to any such sub-agent and to the Related Parties of (i) Lender and (ii) any such sub-agent, and shall apply to their respective activities in connection with the syndication of the credit facilities provided for herein as well as activities as Lender.

SECTION 7.06. Resignation. Subject to the appointment and acceptance of a successor Lender as provided in this paragraph, the Lender may resign at any time by notifying the Lenders and the Borrower. Upon any such resignation, the Required Lenders shall have the right, in consultation with the Borrower, to appoint a successor. If no successor shall have been so appointed by the Required Lenders and shall have accepted such appointment within thirty (30) days after the retiring Lender gives notice of its resignation, then the retiring Lender may, on behalf of the Lenders, appoint a successor Lender which shall be a bank with an office in New York, New York, or an Affiliate of any such bank. Upon the acceptance of its appointment as Lender hereunder by its successor, such successor shall succeed to and become vested with all the rights, powers, privileges and duties of the retiring Lender, and the retiring Lender shall be discharged from its duties and obligations hereunder and under the other Credit Documents. The fees payable by the Borrower to a successor Lender shall be the same as those payable to its predecessor, unless otherwise agreed by the Borrower and such successor. Notwithstanding the foregoing, in the event no successor Lender shall have been so appointed and shall have accepted such appointment within thirty (30) days after the retiring Lender gives notice of its intent to resign, the retiring Lender may give notice of the effectiveness of its resignation to the Lenders and the Borrower, whereupon, on the date of effectiveness of such resignation stated in such notice, (a) the retiring Lender shall be discharged from its duties and obligations hereunder and under the other Credit Documents, provided that, solely for purposes of maintaining any security interest granted to the Lender under the Collateral Documents for the benefit of the Secured Parties, the retiring Lender shall continue to be vested with such security interest as collateral agent for the benefit of the Secured Parties and, in the case of any Collateral in the possession of the Lender, shall continue to hold such Collateral, in each case until such time as a successor Lender is appointed and accepts such appointment in accordance with this paragraph (it being understood and agreed that the retiring Lender shall have no duty or obligation to take any further action under the Collateral Documents, including any action required to maintain the perfection of any such security interest), and (b) the Required Lenders shall succeed to and become vested with all the rights, powers, privileges and duties of the retiring Lender, provided that (i) all payments required to be made hereunder or under any other Credit Document to the Lender for the account of any Person other than the Lender shall be made directly to such Person and (ii) all notices and other communications required or contemplated to be given or made to the Lender shall also directly be given or made to Lender. Following the effectiveness of the Lender's resignation from its capacity as such, the provisions of this Article and Section 8.03, as well as any exculpatory, reimbursement and indemnification provisions set forth in any other Credit Document, shall continue in effect for the benefit of such retiring Lender, its sub-agents and their respective Related Parties in respect of any actions taken or omitted to be taken by any of them while it was acting as Lender and in respect of the matters referred to in the proviso under clause (a) above.

SECTION 7.07. Non-Reliance. Lender acknowledges and agrees that the extensions of credit made hereunder are commercial loan and not investments in a business enterprise or securities. Lender further represents that it is engaged in making, acquiring or holding commercial loan in the ordinary course of its business and has, independently and without reliance upon the Lender or any other

Lender and based on such documents and information as it has deemed appropriate, made its own credit analysis and decision to enter into this Agreement as a Lender, and to make, acquire or hold Term Loan hereunder. Lender shall, independently and without reliance upon the Lender or any other Lender and based on such documents and information (which may contain material, non-public information within the meaning of the United States securities laws concerning the Borrower and its Affiliates) as it shall from time to time deem appropriate, continue to make its own decisions in taking or not taking action under or based upon this Agreement, any other Credit Document, any related agreement or any document furnished hereunder or thereunder and in deciding whether or to the extent to which it will continue as a Lender or assign or otherwise transfer its rights, interests and obligations hereunder.

SECTION 7.08. Other Agency Titles. The list agent titles given to other Lenders shall not have any right, power, obligation, liability, responsibility or duty under this Agreement other than those applicable to all Lenders as such. Without limiting the foregoing, none of such Lenders shall have or be deemed to have a fiduciary relationship with any Lender. Lender hereby makes the same acknowledgments with respect to the relevant Lenders in their respective capacities as list agent titles given to other Lenders, as applicable, as it makes with respect to the Lender in the preceding paragraph.

SECTION 7.09. Not Partners or Co-Venturers; Lender as Representative of the Secured Parties.

(a) The Lenders are not partners or co-venturers, and no Lender shall be liable for the acts or omissions of, or (except as otherwise set forth herein in case of the Lender) authorized to act for, any other Lender. The Lender shall have the exclusive right on behalf of the Lenders to enforce the payment of the principal of and interest on any Term Loan after the date such principal or interest has become due and payable pursuant to the terms of this Agreement.

(b) In its capacity, the Lender is a "representative" of the Secured Parties within the meaning of the term "secured party" as defined in the New York Uniform Commercial Code. Lender authorizes the Lender to enter into each of the Collateral Documents to which it is a party and to take all action contemplated by such documents. Lender agrees that no Secured Party (other than the Lender) shall have the right individually to seek to realize upon the security granted by the Collateral Documents, it being understood and agreed that such rights and remedies may be exercised solely by the Lender for the benefit of the Secured Parties upon the terms of the Collateral Documents. In the event that any Collateral is hereafter pledged by any Person as collateral security for the Obligations, the Lender is hereby authorized, and hereby granted a power of attorney, to execute and deliver on behalf of the Secured Parties any Credit Documents necessary or appropriate to grant and perfect a Lien on such Collateral in favor of the Lender on behalf of the Secured Parties.

## ARTICLE VIII
## MISCELLANEOUS

SECTION 8.01. Notices. All notices and other communications provided for herein shall be in writing and shall be delivered by hand or overnight courier service, mailed by U.S. mail or sent by telecopy (with confirmed receipt or followed by overnight delivery) to the addresses (or telecopy numbers) set forth on the signature pages hereof. Any party hereto may change its address or telecopy number for notices and other communications hereunder by notice to the other parties hereto. All notices and other communications given to any party hereto in accordance with the provisions of this Agreement

shall be deemed to have been given on the date of receipt or, if mailed, the fifth Business Day following the date so mailed, if earlier.

SECTION 8.02. Amendment and Waiver.

(a) No failure or delay by the Lender or any Lender in exercising any right or power hereunder or under any other Credit Document shall operate as a waiver thereof, nor shall any single or partial exercise of any such right or power, or any abandonment or discontinuance of steps to enforce such a right or power, preclude any other or further exercise thereof or the exercise of any other right or power. The rights and remedies of the Lender and the Lenders hereunder and under any other Credit Document are cumulative and are not exclusive of any rights or remedies that they would otherwise have. No waiver of any provision of this Agreement or any other Credit Document or consent to any departure by the Borrower or any other Loan Party therefrom shall in any event be effective unless the same shall be permitted by paragraph (b) of this Section, and then such waiver or consent shall be effective only in the specific instance and for the purpose for which given. Without limiting the generality of the foregoing, the making of a Term Loan shall not be construed as a waiver of any Default, regardless of whether the Lender or any Lender may have had notice or knowledge of such Default at the time.

(b) Neither this Agreement nor any other Credit Document nor any provision hereof or thereof may be waived, amended or modified except (i) in the case of this Agreement, pursuant to an agreement or agreements in writing entered into by the Borrower and the Required Lenders or (ii) in the case of any other Credit Document, pursuant to an agreement or agreements in writing entered into by the Lender and the Loan Party or Loan Parties that are parties thereto, with the consent of the Required Lenders; provided that no such agreement shall (A) increase any Term Loan Commitment of any Lender without the written consent of such Lender, (B) reduce or forgive the principal amount of any Term Loan or reduce the rate of interest thereon, or reduce or forgive any interest or fees payable hereunder, without the written consent of Lender affected thereby, (C) postpone any scheduled date of payment of the principal amount of any Term Loan, or any date for the payment of any interest, fees or other Obligations payable hereunder, or reduce the amount of, waive or excuse any such payment, or postpone the scheduled date of expiration of any Term Loan Commitment, without the written consent of Lender affected thereby, (D) change Section 2.08(b) or 2.08(c) in a manner that would alter the manner in which payments are shared, without the written consent of Lender, (E) change any of the provisions of this Section or the definition of "Required Lenders" or any other provision of any Credit Document specifying the number or percentage of Lenders required to waive, amend or modify any rights thereunder or make any determination or grant any consent thereunder, without the written consent of Lender, (F) release all or substantially all of the Guarantors from their obligations under the Guaranty Agreement (except as otherwise permitted herein or in the other Credit Documents), without the written consent of Lender, or (G) except as provided in any Collateral Document, release all or substantially all of the Collateral, without the written consent of Lender; provided further that no such agreement shall amend, modify or otherwise affect the rights or duties of the Lender hereunder without the prior written consent of the Lender. It is understood and agreed that Borrower and the Lender may amend Annex I by mutual written consent.

(c) The Lenders hereby irrevocably authorize the Lender, at its option and in its sole discretion, to release any Liens granted to the Lender by the Loan Parties on any Collateral (i) upon the termination of all Term Loan Commitments, payment and satisfaction in full in cash of all Obligations, (ii) constituting property being sold or disposed of if the Loan Party disposing of such property certifies to the Lender that the sale or Disposition is made in compliance with the terms of this Agreement (and the

Lender may rely conclusively on any such certificate, without further inquiry), (iii) constituting property leased to a Loan Party under a lease which has expired or been terminated in a transaction permitted under this Agreement, or (iv) as required to effect any sale or other Disposition of such Collateral in connection with any exercise of remedies of the Lender and the Lenders pursuant to Article VI. Except as provided in the preceding sentence, the Lender will not release any Liens on Collateral without the prior written authorization of the Required Lenders. Any such release shall not in any manner discharge, affect, or impair the Obligations or any Liens (other than those expressly being released) upon (or obligations of the Loan Parties in respect of) all interests retained by the Loan Parties, including the proceeds of any sale, all of which shall continue to constitute part of the Collateral. The Lenders hereby authorize the Lender, at its option and in its discretion, to release any Subsidiary Guarantor from its obligations under the Guaranty Agreement if such Person ceases to be a Subsidiary as a result of transactions permitted hereunder.

(d) Furthermore, notwithstanding the foregoing, the Lender, with the consent of the Borrower, may amend, modify or supplement any Credit Document without the consent of any Lender or the Required Lenders in order to correct, amend or cure any ambiguity, inconsistency or defect or correct any typographical error or other manifest error in any Credit Document.

SECTION 8.03. Expenses; Indemnity; Damage Waiver.

(a) The Borrower agrees to pay (i) all reasonable out-of-pocket expenses incurred by the Lender and its Affiliates, including the reasonable fees, charges and disbursements of counsel for the Lender, in connection with the syndication of the credit facilities provided for herein, the preparation and administration of this Agreement and the other Credit Documents and any amendments, modifications or waivers of the provisions hereof or thereof (whether or not the transactions contemplated hereby or thereby shall be consummated) and (ii) all out-of-pocket expenses incurred by the Lender or any Lender, including the reasonable fees, charges and disbursements of any counsel for the Lender or any Lender, in connection with the enforcement, collection or protection of its rights in connection with this Agreement or any of the other Credit Documents, including its rights under this Section, or in connection with the Term Loan made hereunder, including all such out-of-pocket expenses incurred during any workout, restructuring or negotiations in respect of such Term Loan.

(b) The Borrower shall indemnify the Lender and Lender, and each Related Party of any of the foregoing Persons (each such Person being called an "Indemnitee") against, and hold each Indemnitee harmless from, any and all losses, claims, damages, penalties, liabilities and related expenses, including the reasonable fees, charges and disbursements of any counsel for any Indemnitee, incurred by or asserted against any Indemnitee arising out of, in connection with, or as a result of (i) the execution or delivery of this Agreement or any other Credit Document or any agreement or instrument contemplated hereby or thereby, the performance by the parties hereto or the parties to any other Credit Document of their respective obligations hereunder or thereunder or the consummation of the Transactions or any other transactions contemplated hereby or thereby, (ii) any Term Loan or the use of the proceeds thereof, (iii) any actual or alleged presence or release of Hazardous Materials on or from any property owned or operated by the Borrower or any of its Subsidiaries, or any Environmental Liability related in any way to the Borrower or any of its Subsidiaries, or (iv) any actual or prospective claim, litigation, investigation or proceeding relating to any of the foregoing, whether based on contract, tort or any other theory and regardless of whether any Indemnitee is a party thereto; provided that such indemnity shall not, as to any Indemnitee, be available to the extent that such losses, claims, damages, penalties, liabilities or related expenses are determined by a court of competent jurisdiction by final and nonappealable judgment to

have resulted from the gross negligence, bad faith or willful misconduct of such Indemnitee. This Section 8.03(b) and Section 8.03(a), shall not apply with respect to Taxes other than any Taxes that represent losses or damages arising from any non-Tax claim.

(c) To the extent that the Borrower fails to pay any amount required to be paid by it to the Lender under paragraph (a) or (b) of this Section, Lender severally agrees to pay to the Lender such Lender's proportionate share (determined as of the time that the applicable unreimbursed expense or indemnity payment is sought) of such unpaid amount; provided that the unreimbursed expense or indemnified loss, claim, damage, penalty, liability or related expense, as the case may be, was incurred by or asserted against the Lender in its capacity as such.

(d) To the extent permitted by applicable law, the Borrower shall not assert, and hereby waives, any claim against any Indemnitee, on any theory of liability, for special, indirect, consequential or punitive damages (as opposed to direct or actual damages) arising out of, in connection with, or as a result of, any Credit Document or any agreement or instrument contemplated thereby, the Transactions, each Loan or the use of the proceeds thereof.

(e) All amounts due under this Section shall be payable promptly after written demand therefor. The Obligations of the Borrower under this Section shall survive payment in full of the Loan.

SECTION 8.04. Successors and Assigns. The provisions of this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns permitted hereby, except that (i) the Borrower may not assign or otherwise transfer any of its rights or obligations hereunder without the prior written consent of Lender (and any attempted assignment or transfer by the Borrower without such consent shall be null and void) and (ii) no Lender may assign or otherwise transfer its rights or obligations hereunder except with consent from the Lender.

SECTION 8.05. Survival. All covenants, agreements, representations and warranties made by the Borrower in any Credit Document and in the certificates or other instruments delivered in connection with or pursuant to any Credit Document shall be considered to have been relied upon by the other parties hereto and shall survive the execution and delivery of each Credit Document and the making of the Term Loan, regardless of any investigation made by any such other party or on its behalf and notwithstanding that the Lender may have had notice or knowledge of any Default or incorrect representation or warranty at the time any credit is extended hereunder, and shall continue in full force and effect as long as the principal of or any accrued interest on the Term Loan or any fee or any other amount payable under any Credit Document is outstanding and unpaid. The provisions of Section 8.03 shall survive and remain in full force and effect regardless of the consummation of the transactions contemplated hereby, the repayment of the Loan or the termination of this Agreement or any provision hereof.

SECTION 8.06. Right of Setoff. If any amount payable hereunder or under any other Credit Document is not paid as and when due, the Borrower hereby authorizes Lender and each of its affiliates to proceed, to the extent permitted by applicable law, without prior notice, by right of setoff, bankers' lien, counterclaim or otherwise, against any assets of the Borrower in any currency that may at any time be in the possession of such Lender or such affiliate, at any branch or office, to the full extent of all amounts payable to such Lender hereunder or thereunder. The applicable Lender shall give prompt

notice to the Borrower after any exercise of such Lender's rights under the preceding sentence, but the failure to give such notice shall not affect the validity of any of the Lender's actions.

SECTION 8.07. Severability. Any provision of any Credit Document held to be invalid, illegal or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such invalidity, illegality or unenforceability without effecting the validity, legality and enforceability of the remaining provisions thereof; and the invalidity of a particular provision in a particular jurisdiction shall not invalidate such provision in any other jurisdiction.

SECTION 8.08. Governing Law; Jurisdiction; Consent to Service of Process.

(a) This Agreement and any claim, controversy or dispute related to or in connection with this Agreement, any Credit Document or any of the transactions contemplated hereby or thereby, the relationship of the parties hereto and the interpretation and enforcement of the rights and duties of the parties hereto shall be governed by and construed in accordance with the laws of the State of New York (including, without limitation, Section 5-1401 et seq. of the New York General Obligations Law but otherwise without regard to principles of conflicts of laws).

(b) EACH PARTY HERETO HEREBY IRREVOCABLY SUBMITS TO THE EXCLUSIVE JURISDICTION OF ANY FEDERAL OR STATE COURT IN THE STATE OF NEW YORK IN ANY ACTION, SUIT OR PROCEEDING BROUGHT AGAINST IT AND RELATED TO OR IN CONNECTION WITH THIS CREDIT AGREEMENT OR ANY OF THE TRANSACTIONS CONTEMPLATED HEREBY AND CONSENTS TO THE PLACING OF VENUE IN NEW YORK COUNTY OR OTHER COUNTY PERMITTED BY LAW. TO THE EXTENT PERMITTED BY APPLICABLE LAW, EACH PARTY HERETO HEREBY WAIVES AND AGREES NOT TO ASSERT BY WAY OF MOTION, AS A DEFENSE OR OTHERWISE, IN ANY SUCH SUIT, ACTION OR PROCEEDING ANY CLAIM THAT IT IS NOT PERSONALLY SUBJECT TO THE JURISDICTION OF SUCH COURTS, THAT THE SUIT, ACTION OR PROCEEDING IS BROUGHT IN AN INCONVENIENT FORUM, THAT THE VENUE OF THE SUIT, ACTION OR PROCEEDING IS IMPROPER, OR THAT ANY CREDIT DOCUMENT OR INSTRUMENT REFERRED TO HEREIN MAY NOT BE LITIGATED IN OR BY SUCH COURTS. TO THE EXTENT PERMITTED BY APPLICABLE LAW, EACH PARTY HERETO AGREES NOT TO SEEK AND HEREBY WAIVES THE RIGHT TO ANY REVIEW OF THE JUDGMENT OF ANY SUCH COURT BY ANY COURT OF ANY OTHER NATION OR JURISDICTION WHICH MAY BE CALLED UPON TO GRANT AN ENFORCEMENT OF SUCH JUDGMENT. EXCEPT AS PROHIBITED BY LAW, EACH PARTY HERETO HEREBY WAIVES ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION DIRECTLY OR INDIRECTLY ARISING OUT OF, UNDER OR IN CONNECTION WITH ANY CREDIT DOCUMENT.

(c) Each party to this Agreement irrevocably consents to service of process in the manner provided for notices in Section 8.01. Nothing in this Agreement will affect the right of any party to this Agreement to serve process in any other manner permitted by law.

SECTION 8.09. Headings. Article and Section headings used herein are for convenience of reference only, are not part of this Agreement and shall not affect the construction of, or be taken into consideration in interpreting, this Agreement.

SECTION 8.10. Counterparts. This Agreement may be executed in counterparts (and by different parties hereto on different counterparts), each of which shall constitute an original, but all of which when taken together shall constitute a single contract. Delivery of an executed counterpart of a signature page of this Agreement or of any other Credit Document by facsimile or electronic transmission shall be effective as delivery of a manually executed counterpart of this Agreement or of such other Credit Document.

SECTION 8.11. Confidentiality. (a) Each of the Lender and the Lenders agrees to maintain the confidentiality of the Confidential Information, except that Confidential Information may be disclosed (i) to its Related Parties (it being understood that the Persons to whom such disclosure is made will be informed of the confidential nature of such Confidential Information and instructed to keep such Information confidential in accordance with customary practices); (ii) to the extent required or requested by any regulatory authority purporting to have jurisdiction over such Person or its Related Parties; (iii) to the extent required by applicable laws or regulations or by any subpoena or similar legal process; (iv) to any other party hereto; (v) in connection with the exercise of any remedies hereunder or under any other Credit Document or any action or proceeding relating to this Agreement or any other Credit Document or the enforcement of rights hereunder or thereunder; (vi) subject to an agreement containing provisions substantially the same (or at least as restrictive) as those of this Section 8.11 (or as may otherwise be reasonably acceptable to the Borrower), to (x) any assignee of or participant in, or any prospective assignee of or participant in, any of its rights and obligations under this Agreement, or (y) any actual or prospective party (or its Related Parties) to any swap, derivative or other transaction under which payments are to be made by reference to the Borrower and its obligations, this Agreement or payments hereunder; (vii) with the consent of the Borrower; or (viii) to the extent that such Confidential Information (x) becomes publicly available other than as a result of a breach of this Section 8.12, or (y) becomes available to the Lender or any Lender or any of their respective Affiliates on a nonconfidential basis from a source other than the Borrower.

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed by their respective authorized officers as of the day and year first above written.

**BORROWER:**

ST HOLDINGS TOPCO LLC

By_______________________________

Name: Seale Moorer
Title: Member

**Notice Address for Borrower:**

480 Olde Worthington Road
Suite #350
Westerville, Ohio 43082
Attention: Seale Moorer
James Naro
Email: smoorer@exceptionalinnovation.com
jnaro@exceptionalinnovation.com
Fax: +1 614 901-8668

**LENDER:**

Ability Insurance Company, Inc.

By________________________________
Name:
Title:

**Notice Address for Lender:**

Ability Insurance Company, Inc
49 W 23rd Street
8th Floor
New York, New York 10010
Attention:
Email:
Fax:

## Schedule II
## Indebtedness

| Item # | Debt | Amount |
|---|---|---|
| 1 | interTouch Holdings LLC Note to NTT DOCOMO, Inc. | |
| | Principle | 48,050,000.00 |
| | Accrued expenses | 300,000.00 |
| | Accrued and unpaid interest | 3,326,211.03 |
| 2 | ART FM Facility to EI BV and Affiliates[1] | 12,100,000.00 |
| 3 | Société Générale Working Capital Facility (Quadriga France) | 1,439,426.60 |
| 4 | Quadriga France Overdraft Facility | 181,500.00 |
| 5 | Quadriga Denmark Overdraft Facility | 110,110.00 |
| 6 | SQN Equipment Lease | 7,500,000.00 |
| 7 | SQN Working Capital Facility[2] | - |
| 8 | Related Party Loans | 9,507,230.08 |
| 9 | ST Investment Properties -- Loan Payable Ameritas[3] | 6,078,405.73 |
| 10 | ST Investment Properties -- Loan Payable Middlefield Bank[3] | 3,114,446.00 |

Notes:

Notes:

1: ART FM Facility Balance currently €10M, when the SQN Working Capital Facility closes princi be €9M.

2: SQN Working Capital Facility (Ability Insurance) for $2.5M has not closed, closing expected v

3: Balance following the May 1 payment

## Schedule III
## Liens

**Liens granted pursuant to ART Loan**

| Entity | Lien |
| --- | --- |
| Quadriga Holdings Limited | All Assets |
| Quadriga Worldwide Limited | All Assets |
| Quadriga EMEA Limited | All Assets |
| Quadriga Americas | All Assets |
| Exceptional Innovation BV | All Assets |
| Exceptional Innovation Intermediate BV | All Assets |
| Quadriga Benelux BV | All Assets |
| Quadriga Americas, LLC | All Assets |
| Exceptional Innovation, Inc. | All Assets |
| SmarTV LLC | All Assets |
| Quadriga Switzerland | All Assets |
| Quadriga Italy | All Assets |
| ST Holdings LLC | Limited Guarantee |

**Liens granted pursuant to DOCOMO Note**

| Entity | Lien |
| --- | --- |
| InterTouch Topco LLC | Pledge of Member Interest |
| interTouch Holdings LLC | Pledge of Member |
| interTouch Pte. Ltd | Stock Pledge |
| Nomadix Inc. | Stock Pledge |
| Nomadix Inc. | Patent Security Interest |

| | | |
|---|---|---|
| Liens granted pursuant to SQN Equipment Lease | ST Holdings Topco, LLC | Security interest in Equipment |
| Seale A. Moorer, Jr. | | Personal guarantee |
| Liens granted by ST Investment Properties | | |
| Mortgage in Favor of Ameritas | | |
| Mortgage in favor of Middlefield Bank | | |
| Bank deposit pledged to secure lease | interTouch Pte. Ltd | |
| Pledge to secure Singapore credit card | interTouch Pte. Ltd | |

# Schedule IV Litigation

**Litigation Pending**

| | |
|---|---|
| **German employee litigation** | **EUR 250,000** |

| **Gate Worldwide Holdings collection litigation** | **$49,000,000** |
|---|---|

**Schedule V**

**Subsidiaries**

| Name | Domicile | Material | Holding or Operating |
|---|---|---|---|
| ST Holdings Topco LLC | US -Delaware | MATERIAL | Holding |
| ST Holdings LLC | US - Florida | MATERIAL | Holding |
| Exceptional Innovation COOP | Netherlands | MATERIAL | Holding |
| Exceptional Innovation Intermediate BV | Netherlands | MATERIAL | Holding |
| Exceptional Innovation B.V. | Netherlands | MATERIAL | Holding |
| Exceptional Innovation, Inc. | US - Ohio | MATERIAL | Operating |
| SmarTV Company LLC | US - Ohio | MATERIAL | Operating |
| Exceptional Innovation Holdings, Inc. | US - Delaware | MATERIAL | Holding |
| Quadriga EMEA Limited | United Kingdom | MATERIAL | Holding |
| Quadriga Holdings Limited | United Kingdom | MATERIAL | Holding |
| Quadriga Worldwide Limited | United Kingdom | MATERIAL | Operating |
| Quadriga Overseas Holdings Limited | United Kingdom | MATERIAL | Holding |
| Quadriga Technology Limited | United Kingdom | MATERIAL | Holding |
| Quadriga USA Limited | United Kingdom | MATERIAL | Holding |
| Quadriga Americas LLC | US -Arizona | MATERIAL | Operating |
| NXTV Asia Limited | Hong Kong | | Dormant |
| NXTV (Thailand) Limited | Thailand | | Dormant |
| Quadriga Suisse SA | Switzerland | MATERIAL | Operating |
| Quadriga EMEA Romania SARL | Romania | | Operating |
| Quadriga Latvija SIA | Latvia | | Operating |
| Quadriga Poland Sp.z o.o. | Poland | | Operating |
| Quadriga Deutschland GmbH | Germany | | Operating |
| Quadriga Svenska AB | Sweden | | Operating |
| Quadriga Norge AS | Norway | | Operating |
| Quadriga Danmark AS | Demnark | | Operating |
| Quadriga Finland OY | Finland | | Operating |
| Quadriga Italia SpA | Italy | | Operating |
| Quadriga Hellas Hotel Technologies SA | Greece | | Operating |
| Quadriga Business Espana SA | Spain | | Operating |
| UAB Quadriga hotel in room technologies | Lithuania | | Operating |
| Quadriga d.o.o. | In Liquidation | | Dormant |
| Quadriga Middle East FZ-LLC | UAE | | Operating |
| Quadriga Holdings BV | Netherlands | MATERIAL | Holding |

| | | | |
|---|---|---|---|
| Quadriga Benelux BV | Netherlands | MATERIAL | Operating |
| Quadriga France SAS | France | MATERIAL | Operating |

| | | |
|---|---|---|
| Smoovie TV Europe SAS | France | Dormant |
| Thorn France Holdings SAS | France | Dormant |
| Quadriga Belgium NV | Belgium | Operating |
| Czech branch | Branch of Quadrga EMEA | Operating |
| Hungary branch | Branch of Quadrga EMEA | Operating |
| Malta branch | Branch of Quadrga EMEA | Operating |
| Bulgaria branch | Branch of Quadrga | |
| Turkey branch | | |
| Portugal branch | Branch of Quadriga WW | Operating |
| Morocco branch | Branch of Quadriga France | Operating |
| Estonia branch | Branch of Quadriga Finland | Operating |
| Quadriga Austria | Branch of Quadriga Suisse | Operating |
| MagiNet South Africa, Inc. - South Africa Branch | South Africa | Operating |
| InterTouch Egypt Limited | Egypt | Operating |
| MagiNet Interactive Ltd. For Programming LLC | Egypt | Operating |
| DOCOMO interTouch MOROCCO SARL | Morocco | Operating |
| DOCOMO INTERTOUCH (BRASIL) SERVIÇOS DE INFORMÁTICA LTDA | Brazil | Operating |
| interTouch (USA) Inc. | US | Operating |
| MagiNet USA, Inc. | US | Dormant |
| MagiNet South Africa, Inc. | US | Holding |

| | | |
|---|---|---|
| DCMIT MEXICO S. DE R.L. DE C.V. | Mexico | Operating |
| DOCOMO interTouch Számítástechnikai Korlátolt Felelősségű Társaság (also known as DOCOMO interTouch Kft.) | Hungary | Operating |
| DOCOMO interTouch Poland Sp z o.o. | Poland | Operating |
| interTouch Co., Ltd. | Korea | Operating |
| interTouch Company Limited - Macau Branch Office | Macao | Operating |
| interTouch Information Technology (Shanghai) Co., Ltd. 英达特信息技术(上海)有限公司 | China | MATERIAL Operating |
| interTouch Company Limited | Hong Kong | MATERIAL Operating |
| interTouch (Japan) K.K. | Japan | MATERIAL Operating |

| | | |
|---|---|---|
| inter-Touch Pte. Ltd., Taiwan Branch Office | Taiwan | Operating |
| May Shyh Corporation | Taiwan | Operating |
| InterTouch Bahrain Company W.L.L. ش▲نا ةكر▲ت رت▲حبـلا شـتا▲ذ نـير.م.م | Bahrain | Operating |
| interTouch (Jordan) LLC | Jordan | Operating |
| interTouch Interacktif Hizmetler Ticaret Anonim Şirketi | Turkey | Operating |
| interTouch MENA FZ-LLC | UAE | MATERIAL Operating |
| interTouch Pte Ltd | Singapore | MATERIAL Operating/Holding |
| interTouch (Vietnam) Company Limited [VN Name: CONG TY TNHH INTERTOUCH (VIET NAM)] | Vietnam | Operating |
| interTouch (Thailand) Limited | Thailand | Operating |
| inter-Touch (Malaysia) Sdn. Bhd. (formerly known as Netport Hospitality Systems Sdn. Bhd.) | Malaysia | Operating |
| PT. MagiNet Indonesia | Indonesia | MATERIAL Operating |
| interTouch Philippines, Inc. | Philippines | MATERIAL Operating |
| interTouch Business Solutions, Inc. | Philippines | Operating |

| | | |
|---|---|---|
| interTouch Pte. Ltd. - ROHQ | Philippines | Operating |
| MagiNet Philippines, Inc. | Philippines | Dormant |
| interTouch Quadriga (India) Private Limited | India | Operating |
| interTouch Lanka (Pvt) Ltd | Sri Lanka | Operating |
| interTouch Australia Pty. Ltd. (Fiji branch) | Australia | Operating |
| interTouch Australia Pty. Limited | Australia | MATERIAL Operating |
| Azure Wireless Pty. Ltd | Australia | Operating |
| interTouch (Mariana), Inc. | Guam | Operating |
| INTERTOUCH (New Zealand) Ltd. | New Zealand | Operating |
| Nomadix, Inc. US - Delaware | MATERIAL Operating | |
| Nomadix Holdings, Inc. | US - Delaware | Holding |

Schedule VI

Burdensome Agreements

None.

52

KL2 3041638.19

038642/00003/8962130v2

# Schedule VII

## Transactions with Affiliates

**[see attached]**

InterTouch Pte Ltd

List of intercompany loans

| S/N | Date of remittance | Date of payment | Recipients | Entity Code | Curr | Loan Amount |
|---|---|---|---|---|---|---|
| 1 | 28-Sep-15 | 27-Sep-17 | InterTouch Holdings LLC | A7 | SGD | 183,500.00 Intercompany Loan Agreement dated 28 Sep 2015 |
| 2 | 9-Oct-15 | 29-Sep-17 | InterTouch Holdings LLC | A7 | USD | 5,000,000.00 DRIW dated 7 Oct 2015 + Promissory Note dated 7 Oct 2015 |
| 3 | 15-Oct-15 | 14-Oct-17 | InterTouch Holdings LLC | A7 | USD | 153,420.00 Intercompany Loan Agreement dated 15 Oct 2015 |
| 4 | 5-Nov-15 | 4-Nov-17 | InterTouch Holdings LLC | A7 | USD | 18,070.00 Intercompany Loan Agreement dated 5 Nov 2015 |
| 5 | 23-Dec-15 | 29-Sep-17 | InterTouch Holdings LLC | A7 | USD | 702,000.00 DRIW dated 23 Dec 2015 + Promissory Note dated 22 Dec 2015 |
| 6 | 28-Mar-16 | 23-Mar-18 | InterTouch Holdings LLC | A7 | USD | 750,000.00 DRIW dated 23 Mar 2016 + Promissory Note dated 24 Mar 2016 |
| 7 | 2-Jun-16 | 2-Jun-18 | InterTouch Holdings LLC | A7 | USD | 100,000.00 DRIW dated 26 Jun 2016 + Intercompany Loan Agreement 2 Jun 2016 |
| 8 | 14-Jun-16 | 15-Aug-18 | InterTouch Holdings LLC | A7 | USD | 205,000.00 DRIW dated 14 Jun 2016 + Promissory Note dated 16 Aug 2016 |
| 9 | 15-Jun-16 | 21-Jun-18 | InterTouch Holdings LLC | A7 | USD | 745,001.64 DRIW dated 22 Jun 2016 + Promissory Note dated 22 Jun 2016 |
| 10 | 8-Jul-16 | 7-Jul-18 | InterTouch Holdings LLC | A7 | USD | 415,000.00 DRIW dated 8 Jul 2016 + Promissory Note dated 8 Jul 2016 |
| 11 | 20-Jul-16 | 19-Jul-18 | InterTouch Holdings LLC | A7 | USD | 900,000.00 DRIW dated 20 Jul 2016 + Promissory Note dated 20 Jul 2016 |
| 12 | 26-Jul-16 | 25-Jul-18 | InterTouch Holdings LLC | A7 | USD | 1,100,000.00 DRIW dated 26 Jul 2016 + Promissory Note dated 26 Jul 2016 |
| 13 | 10-Aug-16 | 9-Aug-18 | InterTouch Holdings LLC | A7 | USD | 600,000.00 DRIW dated 10 Aug 2016 + Promissory Note dated 10 Aug 2016 |
| 14 | 16-Aug-16 | 15-Aug-18 | InterTouch Holdings LLC | A7 | USD | 265,000.00 DRIW dated 16 Aug 2016 + Promissory Note dated 16 Aug 2016 |
| 15 | 22-Aug-16 | 21-Aug-18 | InterTouch Holdings LLC | A7 | USD | 1,100,000.00 DRIW dated 22 Aug 2016 + Promissory Note dated 22 Aug 2016 |
| 16 | 9-Sep-16 | 8-Sep-18 | InterTouch Holdings LLC | A7 | USD | 2,000,000.00 DRIW dated 9 Sep 2016 + Promissory Note dated 9 Sep 2016 |
| 17 | 14-Sep-16 | 13-Sep-18 | InterTouch Holdings LLC | A7 | USD | 900,000.00 DRIW dated 14 Sep 2016 + Promissory Note dated 14 Sep 2016 |
| 18 | 22-Sep-16 | 21-Sep-18 | InterTouch Holdings LLC | A7 | USD | 800,000.00 DRIW dated 22 Sep 2016 + Promissory Note dated 22 Sep 2016 |
| 19 | 27-Sep-16 | 26-Sep-18 | InterTouch Holdings LLC | A7 | USD | 560,000.00 DRIW dated 27 Sep 2016 + Promissory Note dated 27 Sep 2016 |
| 20 | 29-Sep-16 | 28-Sep-18 | InterTouch Holdings LLC | A7 | USD | 100,000.00 DRIW dated 29 Sep 2016 + Promissory Note dated 29 Sep 2016 |
| 21 | 27-Oct-16 | 31-Dec-17 | InterTouch Holdings LLC | A7 | USD | 180,000.00 DRIW dated 20 Oct 2016 + Promissory Note dated 20 Oct 2016 |
| 22 | 27-Oct-16 | 31-Dec-17 | Quadriga Worldwide Limited | Q1 | USD | 200,000.00 DRIW dated 28 Sep 2016 + Promissory Note dated 27 Oct 2016 |

KL2 3041638.19

038642/00003/8962130v2

| | | | | | | |
|---|---|---|---|---|---|---|
| 23 | 14-Nov-16 | 31-Dec-17 | Exceptional Innovations, Inc | E8 | USD | 180,000.00 DRIW dated 14 Nov 2016 + Promissory Note dated 14 Nov 2016 |
| 24 | 14-Nov-16 | 31-Dec-17 | Quadriga Worldwide Limited | Q1 | USD | 500,000.00 DRIW dated 14 Nov 2016 + Promissory Note dated 14 Nov 2016 |
| 25 | 28-Nov-16 | 31-Dec-17 | Quadriga Holdings Limited | Q2 | USD | 500,000.00 DRIW dated 26 Nov 2016 + Promissory Note dated 26 Nov 2016 |
| 26 | 14-Dec-16 | 31-Dec-17 | Quadriga Holdings Limited | Q2 | USD | 600,000.00 DRIW dated 13 Dec 2016 + Promissory Note dated 14 Dec 2016 |
| 27 | 14-Dec-16 | 31-Dec-17 | InterTouch Holdings LLC | A7 | USD | 180,000.00 DRIW dated 14 Dec 2016 + Promissory Note dated 14 Dec 2016 |
| 28 | 20-Dec-16 | 20-Dec-17 | InterTouch Topco LLC | A9 | USD | 25,911.00 Loan agreement dated 20 Dec 2016 (relating to audit fee) |
| 29 | 29-Dec-16 | 27-Dec-18 | InterTouch Holdings LLC | A7 | USD | 750,000.00 DRIW dated 28 Dec 2016 + Promissory Note dated 28 Dec 2016 |
| 30 | 12-Jan-17 | 31-Dec-17 | InterTouch Holdings LLC | A7 | USD | 54,000.00 DRIW dated 11 Jan 2017 + Promissory Note dated 11 Jan 2017 |
| 31 | 12-Jan-17 | 31-Dec-17 | Quadriga Worldwide Limited | Q1 | USD | 25,000.00 DRIW dated 11 Jan 2017 + Promissory Note dated 11 Jan 2017 |
| 32 | 12-Jan-17 | 31-Dec-17 | InterTouch Holdings LLC | A7 | USD | 160,000.00 DRIW dated 11 Jan 2017 + Promissory Note dated 11 Jan 2017 |
| 33 | 26-Jan-17 | 31-Dec-17 | Quadriga Holdings Limited | Q2 | USD | 500,000.00 DRIW dated 23 Jan 2017 + Promissory Note dated 23 Jan 2017 |
| 34 | 15-Feb-17 | 31-Dec-17 | InterTouch Holdings LLC | A7 | USD | 100,000.00 DRIW dated 14 Feb 2017+ Promissory Note dated 14 Feb 2017 |
| 35 | 22-Mar-17 | 21-Mar-19 | InterTouch Holdings LLC | A7 | USD | 750,000.00 DRIW dated 22 Mar 2017+ Promissory Note dated 22 Mar 2017 |
| 36 | 12-Apr-17 | 31-Dec-17 | InterTouch Holdings LLC | A7 | USD | 250,000.00 DRIW dated 12 Apr 2017+ Promissory Note dated 12 Apr 2017 |
| 37 | 17-May-17 | 17-May-18 | InterTouch Holdings LLC | A7 | SGD | 10,000.00 Loan agreement dated 18 May 2017 (payment to Rajah & Tann Singapore) |
| 38 | 17-May-17 | 31-Dec-17 | InterTouch Holdings LLC | A7 | USD | 600,000.00 DRIW dated 18 May 2017+ Promissory Note dated 18 May 2017 |
| 39 | 1-Jun-17 | 30-Sep-17 | InterTouch Holdings LLC | A7 | USD | 135,000.00 DRIW dated 1 Jun 2017+ Promissory Note dated 1 Jun 2017 |
| 40 | 29-Jun-17 | 27-Jun-18 | InterTouch Holdings LLC | A7 | USD | 600,000.00 DRIW dated 28 Jun 2017+ Promissory Note dated 28 Jun 2017 |
| 41 | 4-Jul-17 | 2-Jul-18 | InterTouch Holdings LLC | A7 | USD | 200,000.00 DRIW dated 3 Jul. 2017+ Promissory Note dated 3 Jul. 2017 |
| 42 | 7-Jul-17 | 6-Jul-18 | Quadriga Worldwide Limited | Q1 | USD | 50,000.00 DRIW dated 7 Jul. 2017+ Promissory Note dated 7 Jul. 2017 |
| 43 | 11-Jul-17 | 11-Jul-18 | InterTouch Holdings LLC | A7 | SGD | 11,150.84 Loan agreement dated 11 July 2017 (payment to Rajah & Tann Singapore) |
| 44 | 29-Jul-17 | 31-Aug-17 | Quadriga Worldwide Limited | Q1 | USD | 80,000.00 DRIW dated 28 Jul. 2017+ Promissory Note dated 28 Jul. 2017 |
| 45 | 7-Sep-17 | 30-Sep-17 | InterTouch Holdings LLC | A7 | USD | 125,000.00 DRIW dated 7 Sep 2017+ Promissory Note dated 7 Sep 2017 |
| 46 | 22-Sep-17 | 21-Sep-18 | Quadriga Worldwide Limited | Q1 | USD | 100,000.00 DRIW dated 22 Sep 2017+ Promissory Note dated 22 Sep 2017 |
| | | | TOTAL | | SGD | 204,710.84 |
| | | | | | USD | 23,419,392.64 |

KL2 3041638.19

038642/00003/8962130v2



ntercompany loans (principal only)
s of 11/7/2017

| Loan Date | Lender | Lendee | Loan Amount |
|---|---|---|---|
| 10/13/2016 | DCMT Mexico | Quadriga Hold | 200,000.00 |
| | DCMT Mexico S de R L de CV | | 200,000.00 |
| 11/17/2015 | InterTouch (US | InterTouch Ho | 1,785,000.00 |
| 9/28/2016 | InterTouch (US | InterTouch Ho | 200,000.00 |
| 10/13/2016 | InterTouch (US | Quadriga Hold | 60,000.00 |
| 12/2/2016 | InterTouch (US | Nomadix, | 200,000.00 |
| 1/11/2017 | InterTouch (US | The SmarTV Co | 450,000.00 |
| 1/25/2017 | InterTouch (US | Quadriga Hold | 180,000.00 |
| 9/5/2017 | InterTouch (US | Quadriga Hold | 100,000.00 |
| 10/5/2017 | InterTouch (US | The SmarTV Co | 75,000.00 |
| | InterTouch (USA), Inc. | | 3,050,000.00 |
| 9/29/2015 | Nomadix, Inc. | InterTouch Ho | 10,000,000.00 |
| 10/13/2016 | Nomadix, Inc. | The SmarTV Co | 80,000.00 |
| 1/25/2017 | Nomadix, Inc. | Quadriga Hold | 450,000.00 |
| 5/17/2017 | Nomadix, Inc. | InterTouch Ho | 600,000.00 |
| 6/28/2017 | Nomadix, Inc. | InterTouch Ho | 400,000.00 |
| 7/5/2017 | Nomadix, Inc. | InterTouch Ho | 50,000.00 |
| 7/12/2017 | Nomadix, Inc. | InterTouch Ho | 50,000.00 |
| 7/31/2017 | Nomadix, Inc. | InterTouch Ho | 100,000.00 |
| 8/3/2017 | Nomadix, Inc. | InterTouch Ho | 400,000.00 |
| 8/8/2017 | Nomadix, Inc. | InterTouch Ho | 405,000.00 |
| 8/17/2017 | Nomadix, Inc. | Quadriga Hold | 500,000.00 |
| 8/23/2017 | Nomadix, Inc. | InterTouch Ho | 600,000.00 |
| 8/24/2017 | Nomadix, Inc. | InterTouch Ho | 1,200,000.00 |
| 8/29/2017 | Nomadix, Inc. | Quadriga Hold | 450,000.00 |
| 9/5/2017 | Nomadix, Inc. | Quadriga Hold | 205,000.00 |

| | | | | |
|---|---|---|---|---|
| 9/7/2017 | Nomadix, Inc. | The SmarTV Co | | 250,000.00 |
| 10/5/2017 | Nomadix, Inc. | The SmarTV Co | | 175,000.00 |
| | Nomadix, Inc. Total | | | 15,915,000.00 |
| Grand Total | | | | 19,165,000.00 |

GBP

Debtors Creditors — Debtors Creditors Debtors — Creditors Debtors Creditors Debtors Creditors Debtors — Creditors Debtors Creditors Debtors Creditors Debtors Creditors Debtors Creditors Debtors Creditors Debtors Creditors Debtors Creditors Debtors Creditors

| Counterparty | Group Loans / As at 30 November 2017 / Suisse | | Quadriga Worldwide / Quadriga Italia | | | Quadriga Holdings Ltd | | Quadriga Overseas Ltd | | Quadriga EMEA Ltd | | Exceptional Innovation BV | | xceptional Innovation Intermediate B | | Quadriga USA | | Exceptional Innovation Inc | | The SmarTV Company LLC | | Quadriga Americas | | Quadriga Holdings BV | | Quadriga Benelux | | Quadriga | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| [redacted] | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Quadriga Suisse | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Quadriga World | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Quadriga Holdin | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Quadriga Holdin | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Quadriga Overs | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Quadriga Ameri | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| The SmarTV Co | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Exceptional Inno | | | | 12,152,520 | | | | | | | | | | | | | | | | | | | | | | | (5,641) | | 12,146,879 | (12,146,879) |
| Exceptional Inn [redacted] | | | | | (1,140,499) | | | | | | | | | | | | | | | | | | | 5,641 | | | | | (1,134,858) | 1,134,858 |
| Exceptional Inno | | | | 27,018,281 | | | | | (2,713,145) | | (180,018) | | | | | | | | | 68,163 | | | | | | | | | 24,193,281 | (24,193,281) |
| Quadriga EME [redacted] | | | | 9,722,958 | | | | | | | | | | | | | | | | | | | | | | | | | 9,722,958 | (9,722,958) |
| Quadriga Italia S | | | (27,018,281) | | | | (159,404,016) | | (992,483) | | (1,087,064) | | | | | 3,543,545 | | | (10,901,025) | | (14,885,107) | | (9,722,958) | | (12,152,520) | 1,140,499 | | 8,136,328 | (223,343,082) | 223,343,082 |
| | | | | 159,404,016 | | | | | | | | | | | | | | | | | | | | | | | | | 159,404,016 | (159,404,016) |
| Total Obligors | | | (68,163) | 14,885,107 | | | | | | | | | | | | | (16,542) | | | | | | | | | | | | 14,800,402 | (14,800,402) |
| | | | | 10,901,025 | | | | | | | | | | | | 6,659,131 | | | (6,659,131) | 16,542 | | | | | | | | | 17,560,156 | (17,560,156) |
| Quadriga Hellas | | | | | (3,543,545) | | | | | 1,962,829 | | | | | | | (1,962,829) | | | | | | | | | | | | (8,223,305) | 8,223,305 |
| Quadriga Busin | 180,018 | | | 1,087,064 | | | | | | | | | | | | | | | | | | | | | | | | | (695,747) | 695,747 |
| Quadriga Danm | | | | | | | | | | | | | | | | | | | | | | | | | | | | | 0 | 0 |
| Quadriga Finlan | 2,713,145 | | | 992,483 | | | | | | | | | | | | | | | | | | | | | | | | | 3,705,628 | (3,705,626) |
| Quadriga Latvija | | | | | (8,136,326) | | | | | | | | | | | | | | | | | | | | | | | | (8,136,326) | 8,136,328 |
| UAB Quadriga H | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Quadriga Norge | 2,893,163 | | (27,086,444) | 236,163,454 | (12,820,372) | 0 | (159,404,016) | 0 | (3,705,628) | 1,962,829 | (1,267,082) | 0 | 0 | 0 | 0 | 10,202,676 | (1,979,371) | 0 | (17,560,156) | 84,705 | (14,885,107) | 0 | (9,722,958) | 5,641 | (12,152,520) | 1,140,499 | (5,641) | 8,136,328 | 0 | 0 |
| Quadriga Polan | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Quadriga Svens | | | (1,105) | 40,102 | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Exceptional Inno | | | | | (5,269,264) | | | | | | | | | | | | | | | | | | | | | | | | | |
| Quadriga Belgiu | | | | | (1,673,069) | | | | | | | | | | | | | | | | | | | | | | | | | |
| Quadriga Deuts | | | | | (1,322,303) | | | | | | | | | | | | | | | | | | | | | | | | | |
| Quadriga EMEA | | | | | (67,306) | | | | | | | | | | | | | | | | | | | | | | | | | |
| Quadriga Middle | | | | | (75,846) | | | | | | | | | | | | | | | | | | | | | | | | | |
| Quadriga Franc | | | | | (3,229,866) | | | | | | | | | | | | | | | | | | | | | | | | | |
| Thom France H | 514 | | | | (1,287,949) | | | | | | | | | | | | | | | | | | | | | | | | | |
| Smoovie TV Eu | | | | | (1,915,434) | | | | | | | | | | | | | | | | | | | | | | | | | |
| [redacted] | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Total Non obligo | | | | | (12,240,489) | | | | | | | | | | | | | | | | | | | | | | | | | |
| [redacted] | | | | | (596,438) | | | | | | | | | | | | | | | | | | | 631 | | | | | | |
| T[redacted] | | | (1,190) | 467,050 | (27,574,421) | | | | | | | | | | | | | | | | | | | | | | | | (83,030) | |

| | | | | | | | | | | | | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 514 | (2,295) | 507,152 | (55,252,385) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 631 | 0 | 0 | 0 | 0 | (83,030) |
| 2,893,677 | (27,088,739) | 236,670,606 | (68,072,757) | 0 | (159,404,016) | 0 | (3,705,623) | 1,962,829 | (1,267,082) | 0 | 0 | 0 | 0 | 10,202,676 | (1,979,371) | 0 | (17,560,156) | 84,705 | (14,885,107) | 0 | (9,722,958) | 6,272 | (12,152,520) | 1,140,499 | (5,641) | 8,136,328 | (63,030) |

**Schedule VIII**

**Investments**

Investments in Subsidiaries set forth in Schedule V.

59

KL2 3041638.19

038642/00003/8962130v2

**Schedule**

**IX**

**Patents**

60

KL2 3041638.19

038642/00003/8962130v2

| Title of Invention: | Country | Application No. | Filing Date: | Patent No: | Date Issued: | Publication Number: | Publication Date: |
|---|---|---|---|---|---|---|---|
| SHAPING OUTGOING TRAFFIC OF NETWORK PACKETS IN A NETWORK MANAGEMENT SYSTEM | US | 14/880099 | 10/9/2015 | 9641424 | 5/2/2017 | | |
| SYSTEMS AND METHODS FOR PROVIDING CONTENT AND SERVICES ON A NETWORK SYSTEM | US | 14/335587 | 7/18/2014 | 9548935 | 1/17/2017 | 2015/0088710 A1 | 3/26/2015 |
| SYSTEMS AND METHODS FOR NETWORK ADDRESS TRANSLATION | US | 14/478429 | 9/5/2014 | 9491136 | 11/8/2016 | 2015/0215275 A1 | 7/30/2015 |
| SYSTEMS AND METHODS FOR INJECTING CONTENT | US | 14/517066 | 10/17/2014 | 9330400 | 5/3/2016 | 2015/0206186 A1 | 7/23/2015 |
| SYSTEMS AND METHODS FOR CONTROLLING USER PERCEIVED | US | 14/675563 | 3/31/2015 | 9160672 | 10/13/2015 | 2015/0236965 A1 | 8/20/2015 |
| SYSTEMS AND METHODS FOR DYNAMIC DATA TRANSFER MANAGEMENT ON A PER SUBSCRIBER BASIS IN A COMMUNICATIONS NETWORK | US | 14/146971 | 1/3/2014 | 9160674 | 10/13/2015 | 2014/0215089 A1 | 7/31/2014 |
| ZONE MIGRATION IN NETWORK ACCESS | US | 14/057481 | 10/18/2013 | 9141773 | 9/22/2015 | 2014/0047514 A1 | 2/13/2014 |
| SYSTEMS AND METHODS FOR GROUP BANDWIDTH MANAGEMENT IN A COMMUNICATION SYSTEMS | US | 13/352255 | 1/17/2012 | 9118578 | 8/25/2015 | 2012/0185586 A1 | 7/19/2012 |
| SYSTEMS AND METHODS FOR INJECTING CONTENT | US | 11/864319 | 9/28/2007 | 8868740 | 10/21/2014 | 2008/0148383 A1 | 6/19/2008 |
| SYSTEMS AND METHODS FOR NETWORK ADDRESS TRANSLATION | US | 13/756341 | 1/31/2013 | 8832315 | 9/9/2014 | 2013/0238812 A1 | 9/12/2013 |
| SERIAL REDIRECTOR DEVICE AND ASSOCIATED METHODS | US | 13/481060 | 5/25/2012 | 8804717 | 8/12/2014 | 2012/0300788 A1 | 11/29/2012 |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| SYSTEMS AND METHODS FOR PROVIDING CONTENT AND SERVICES ON A NETWORK SYSTEM | US | 14/094712 | 12/2/2013 | 8788690 | 7/22/2014 | 2014/0089182 A1 | 3/27/2014 |
| SYSTEMS AND METHODS FOR PROVIDING CONTENT AND SERVICES ON A NETWORK SYSTEM | US | 14/059213 | 10/21/2013 | 8725888 | 5/13/2014 | 2014/0059222 A1 | 2/27/2014 |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| SYSTEMS AND METHODS FOR PROVIDING CONTENT AND SERVICES ON A NETWORK SYSTEM | US | 14/059263 | 10/21/2013 | 8725899 | 5/13/2014 | 2014/0047093 A1 | 2/13/2014 |
| SYSTEMS AND METHODS FOR AUTHORIZING, AUTHENTICATING AND ACCOUNTING USERS HAVING TRANSPARENT COMPUTER ACCESS TO A | US | 09/458602 | 12/8/1999 | 8713641 | 4/29/2014 | | |
| SYSTEMS AND METHODS FOR DYNAMIC DATA TRANSFER MANAGEMENT ON A PER SUBSCRIBER BASIS IN A COMMUNICATIONS NETWORK | US | 13/094769 | 4/26/2011 | 8626922 | 1/7/2014 | 2011/0199932 A1 | 8/18/2011 |
| SYSTEM AND METHOD FOR AUTHORIZING A PORTABLE | US | 13/271099 | 10/11/2011 | 8613053 | 12/17/2013 | 2012/0030737 A1 | 2/2/2012 |
| SYSTEMS AND METHODS FOR PROVIDING CONTENT AND SERVICES ON A NETWORK SYSTEM | US | 13/659851 | 10/24/2012 | 8606917 | 12/10/2013 | 2013/0055358 A1 | 2/28/2013 |
| ZONE MIGRATION IN NETWORK ACCESS | US | 13/478458 | 5/23/2012 | 8566912 | 10/22/2013 | 2012/0297459 A1 | 11/22/2012 |
| SYSTEMS AND METHODS OF COMMUNICATING USING XML | US | 13/462585 | 5/2/2012 | 8516083 | 8/20/2013 | 2012/0278494 A1 | 11/1/2012 |
| SYSTEMS AND METHODS FOR PROVIDING CONTENT AND SERVICES ON A NETWORK SYSTEM | US | 13/566961 | 8/3/2012 | 8370477 | 2/5/2013 | 2012/0311152 A1 | 12/6/2012 |
| SYSTEMS AND METHODS FOR NETWORK ADDRESS TRANSLATION | US | 13/550079 | 7/16/2012 | 8370524 | 2/5/2013 | 2012/0284364 A1 | 11/8/2012 |
| SYSTEMS AND METHODS FOR PROVIDING CONTENT AND SERVICES ON A NETWORK SYSTEM | US | 13/566904 | 8/3/2012 | 8364806 | 1/29/2013 | 2012/0303812 A1 | 11/29/2012 |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| SYSTEMS AND METHODS FOR PROVIDING DYNAMIC NETWORK AUTHORIZATION, AUTHENTICATION AND ACCOUNTING | US | 12/685585 | 1/11/2010 | 8266266 | 9/11/2012 | 2010/0115113 A1 | 5/6/2010 |
| SYSTEMS AND METHODS FOR PROVIDING CONTENT AND SERVICES ON A NETWORK SYSTEM | US | 13/329867 | 12/19/2011 | 8266269 | 9/11/2012 | 2012/0096159 A1 | 4/19/2012 |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| SYSTEMS AND METHODS FOR PROVIDING CONTENT AND SERVICES ON A NETWORK SYSTEM | US | 12/875043 | 9/2/2010 | 8244886 | 8/14/2012 | 2010/0332615 A1 | 12/30/2010 |
| INTELLIGENT NETWORK ADDRESS TRANSLATOR AND METHODS FOR | US | 13/276217 | 10/18/2011 | 8234409 | 7/31/2012 | 2012/0036224 A1 | 2/9/2012 |
| GATEWAY DEVICE HAVING AN XML INTERFACE AND ASSOCIATED | US | 09/693512 | 10/20/2000 | 8190708 | 5/29/2012 | | |
| SYSTEMS AND METHODS FOR PROVIDING CONTENT AND SERVICES ON A NETWORK SYSTEM | US | 13/244866 | 9/26/2011 | 8156246 | 4/10/2012 | 2012/0017009 A1 | 1/19/2012 |
| REEXAMINATION OF U.S. PATENT NO. 6,779,118 USER SPECIFIC AUTOMATIC DATA REDIRECTION SYSTEM, WHICH IS DIRECTED TO CONTROLLING NETWORK TRAFFIC (E.G., REDIRECTING OR FILTERING TRAFFIC) BASED ON RULE SETS MAINTAINED BY A REDIRECTION | US | 90/009301 | 10/10/2008 | 6779118 C1 | 3/27/2012 | | |
| INTELLIGENT NETWORK ADDRESS TRANSLATOR AND METHODS FOR | US | 12/908341 | 10/20/2010 | 8051206 | 11/1/2011 | 2011/0035479 A1 | 2/10/2011 |
| SYSTEM AND METHOD FOR ESTABLISHING NETWORK CONNECTION | US | 12/240427 | 9/29/2008 | 8027339 | 9/27/2011 | 2009/0024745 A1 | 1/22/2009 |
| SYSTEMS AND METHODS FOR DYNAMIC DATA TRANSFER MANAGEMENT ON A PER SUBSCRIBER BASIS IN A COMMUNICATIONS NETWORK | US | 12/771915 | 4/30/2010 | 7953857 | 5/31/2011 | 2010/0208743 A1 | 8/19/2010 |
| INTELLIGENT NETWORK ADDRESS TRANSLATOR AND METHODS FOR | US | 12/830264 | 7/2/2010 | 7822873 | 10/26/2010 | 2010/0272109 A1 | 10/28/2010 |

KL2 3041638.19

038642/00003/8962130v2

| INTELLIGENT NETWORK ADDRESS TRANSLATOR AND METHODS FOR | US | 10/271640 | 10/15/2002 | 7752334 | 7/6/2010 | 2004/0073704 A1 | 4/15/2004 |
|---|---|---|---|---|---|---|---|

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| SYSTEMS AND METHODS FOR DYNAMIC BANDWIDTH MANAGEMENT ON A PER SUBSCRIBER BASIS IN A NETWORK | US | 09/693481 | 10/20/2000 | 7739383 | 6/15/2010 | | |
| SYSTEMS AND METHODS FOR BANDWIDTH MANAGEMENT ON A PER SUBSCRIBER BASIS IN A NETWORK | US | 12/579820 | 10/15/2009 | 7698432 | 4/13/2010 | 2010/0020685 A1 | 1/28/2010 |
| SYSTEMS AND METHODS FOR DYNAMIC NETWORK AUTHENTICATION AND | US | 11/427143 | 6/28/2006 | 7689716 | 3/30/2010 | 2006/0239254 | 10/26/2006 |
| SYSTEM AND METHOD FOR ESTABLISHING NETWORK CONNECTION WITH UNKNOWN NETWORK AND/OR | US | 11/097925 | 4/1/2005 | 7554995 | 6/30/2009 | US 2005-0188092 A1 | 8/25/2005 |
| LOCATION-BASED IDENTIFICATION FOR USE IN A COMMUNICATIONS | US | 09/693511 | 10/20/2000 | 7197556 | 3/27/2007 | | |
| SYSTEMS AND METHODS FOR DYNAMIC NETWORK AUTHENTICATION AND | US | 09/693060 | 10/20/2000 | 7194554 | 3/20/2007 | | |
| METHOD AND APPARATUS FOR ESTABLISHING DYNAMIC TUNNEL SESSIONS IN A COMMUNICATION | US | 09/693369 | 10/20/2000 | 7117526 | 10/3/2006 | | |
| SYSTEM AND METHOD FOR NETWORK CONNECTION WITH NETWORK AND/OR USER DEVICE | US | 09/684937 | 10/6/2000 | 7088727 | 8/8/2006 | | |
| SYSTEMS AND METHODS FOR USERS HAVING TRANSPARENT COMPUTER ACCESS TO A NETWORK USING A DEVICE HAVING REDIRECTION | US | 90/007220 | 9/24/2004 | 6636894 | 3/28/2006 | | |
| SYSTEMS AND METHODS FOR NETWORK GATEWAY DEVICE WITH | US | 09/693061 | 10/20/2000 | 6868399 | 3/15/2005 | | |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| MANAGEMENT SYSTEMS | | | | | | | |
| SYSTEM AND METHOD FOR NETWORK ACCESS WITHOUT | US | 09/694577 | 10/23/2000 | 6857009 | 2/15/2005 | | |

KL2 3041638.19

038642/00003/8962130v2

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| METHODS AND SYSTEMS PROVIDING FAIR QUEUING AND PRIORITY SCHEDULING TO ENHANCE QUALITY OF SERVICE IN A NETWORK | US | 10/060273 | 1/30/2002 | 6810426 | 10/26/2004 | US 2002-0178282 A1 | 11/28/2002 |
| INFORMATION AND CONTROL CONSOLE FOR USE WITH A NETWORK GATEWAY | US | 09/541877 | 4/3/2000 | 6789110 | 9/7/2004 | | |
| SYSTEMS AND METHODS FOR REDIRECTING USERS HAVING TRANSPARENT COMPUTER ACCESS TO A NETWORK USING A GATEWAY | US | 09/458569 | 12/8/1999 | 6636894 | 10/21/2003 | | |
| SYSTEM FOR PROVIDING INTERNET ACCESS FROM LOCATIONS DIFFERENT FROM THOSE FOR WHICH THE USER'S SOFTWARE WAS CONFIGURED | US | 09/097603 | 6/15/1998 | 6377990 | 4/23/2002 | | |
| SYSTEMS AND METHODS FOR PROVIDING CONTENT AND SERVICES ON A NETWORK SYSTEM | US | 15/406618 | 1/13/2017 | - | - | 2017/0230250 A1 | 8/10/2017 |
| SYSTEMS AND METHODS FOR INJECTING CONTENT | US | 15/142706 | 4/29/2016 | - | - | 2017/0034287 A1 | 2/2/2017 |
| ZONE MIGRATION IN NETWORK ACCESS | US | 14/855221 | 9/15/2015 | - | - | 2016/0173448 A1 | 6/16/2016 |
| SYSTEMS AND METHODS FOR DYNAMIC DATA TRANSFER MANAGEMENT ON A PER SUBSCRIBER BASIS IN A COMMUNICATIONS NETWORK | US | 14/879567 | 10/9/2015 | - | - | 2016/0205031 A1 | 7/14/2016 |
| SYSTEMS AND METHODS FOR NETWORK ADDRESS TRANSLATION | US | 15/343587 | 11/4/2016 | - | - | 2017/0214652 A1 | 7/27/2017 |
| SYSTEMS AND METHODS FOR GROUP BANDWIDTH MANAGEMENT IN A COMMUNICATION SYSTEMS | US | 14/832945 | 8/21/2015 | - | - | 2016/0057017 A1 | 2/25/2016 |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| TRAVELER TRACKING SYSTEM | US | 14/538580 | 11/11/2014 | - | - | 2015/0134451 A1 | 5/14/2015 |
| SHAPING OUTGOING TRAFFIC OF NETWORK PACKETS IN A NETWORK MANAGEMENT SYSTEM | US | 15/497919 | 4/26/2017 | - | - | 2018/0013659 A1 | 1/11/2018 |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| SYSTEMS AND METHODS FOR CONTENT AND SERVICES ON A NETWORK SYSTEM | US | 15/788291 | 10/19/2017 | - | - | - | - |

27463115

| Title of Invention: | Country | Application No. | Filing Date: | Patent No: | Date Issued: | Publication Number: | Publication Date: |
|---|---|---|---|---|---|---|---|
| SYSTEMS AND METHODS FOR GROUP BANDWIDTH MANAGEMENT IN A COMMUNICATION SYSTEMS | HK | 14104688.3 | 5/19/2014 | HK1191471 | 11/17/2017 | 1191471A | 7/25/2014 |
| SYSTEMS AND METHODS FOR GROUP BANDWIDTH MANAGEMENT IN A COMMUNICATION SYSTEMS | HK | 14104868.5 | 5/23/2014 | HK1191771 | 4/7/2017 | 1191771A | 8/1/2014 |
| SYSTEMS AND METHODS FOR GROUP BANDWIDTH MANAGEMENT IN A COMMUNICATION SYSTEMS | JP | 2013-550543 | 7/18/2013 | 6104178 | 3/10/2017 | 2014-509474 | 4/17/2014 |
| ZONE MIGRATION IN NETWORK ACCESS | CA | 2767245 | 7/2/2010 | 2767245 | 12/20/2016 | | |
| SYSTEMS AND METHODS FOR GROUP BANDWIDTH MANAGEMENT IN A COMMUNICATION SYSTEMS | AU | 2012207471 | 7/23/2013 | 2012207471 | 11/10/2016 | | |
| SYSTEMS AND METHODS FOR GROUP BANDWIDTH MANAGEMENT IN A COMMUNICATION SYSTEMS | CN | 2.0128E+11 | 8/30/2013 | ZL201280011004.9 | 8/17/2016 | CN103404095A | 11/20/2013 |
| SYSTEMS AND METHODS FOR PROVIDING DYNAMIC NETWORK AUTHORIZATION, AUTHENTICATION AND | CA | 2725720 | 10/20/2000 | 2725720 | 8/9/2016 | | |
| ZONE MIGRATION IN NETWORK ACCESS | KR | 10-2012-7003262 | 7/2/2010 | 10-1625173 | 5/23/2016 | | |
| SYSTEMS AND METHODS FOR GROUP BANDWIDTH MANAGEMENT IN A COMMUNICATION SYSTEMS | BE | 12701629.3 | 7/18/2013 | 2666266 | 5/11/2016 | 2666266 | 11/27/2013 |
| SYSTEMS AND METHODS FOR GROUP BANDWIDTH MANAGEMENT IN A COMMUNICATION SYSTEMS | DE | 12701629.3 | 7/18/2013 | 60 2012 018 310.1 | 5/11/2016 | 2666266 | 11/27/2013 |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| SYSTEMS AND METHODS FOR GROUP BANDWIDTH MANAGEMENT IN A COMMUNICATION SYSTEMS | EP | 12701629.3 | 7/18/2013 | 2666266 | 5/11/2016 | 2666266 | 11/27/2013 |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| SYSTEMS AND METHODS FOR GROUP BANDWIDTH MANAGEMENT IN A COMMUNICATION SYSTEMS | ES | 12701629.3 | 7/18/2013 | 2666266 | 5/11/2016 | 2666266 | 11/27/2013 |
| SYSTEMS AND METHODS FOR GROUP BANDWIDTH MANAGEMENT IN A COMMUNICATION SYSTEMS | FR | 12701629.3 | 7/18/2013 | 2666266 | 5/11/2016 | 2666266 | 11/27/2013 |
| SYSTEMS AND METHODS FOR GROUP BANDWIDTH MANAGEMENT IN A COMMUNICATION SYSTEMS | GB | 12701629.3 | 7/18/2013 | 2666266 | 5/11/2016 | 2666266 | 11/27/2013 |
| SYSTEMS AND METHODS FOR GROUP BANDWIDTH MANAGEMENT IN A COMMUNICATION SYSTEMS | IT | 12701629.3 | 7/18/2013 | 5.02016E+14 | 5/11/2016 | 2666266 | 11/27/2013 |
| SYSTEMS AND METHODS FOR GROUP BANDWIDTH MANAGEMENT IN A COMMUNICATION SYSTEMS | NL | 12701629.3 | 7/18/2013 | 2666266 | 5/11/2016 | 2666266 | 11/27/2013 |
| ZONE MIGRATION IN NETWORK ACCESS | AU | 2010270756 | 7/2/2010 | 2010270756 | 12/10/2015 | | |
| ZONE MIGRATION IN NETWORK ACCESS | JP | 2012-519631 | 7/2/2010 | 5830017 | 10/30/2015 | | |
| SYSTEMS AND METHODS FOR GROUP BANDWIDTH MANAGEMENT IN A COMMUNICATION SYSTEMS | SG | 2013054648 | 7/17/2013 | 192006 | 10/26/2015 | | |
| SYSTEM AND METHOD FOR NETWORK ACCESS WITHOUT | DE | 991875.6 | 10/20/2000 | 60049040.8 | 8/12/2015 | 1234246 | 8/28/2002 |
| SYSTEM AND METHOD FOR NETWORK ACCESS WITHOUT | EP | 991875.6 | 10/20/2000 | 1234246 | 8/12/2015 | 1234246 | 8/28/2002 |
| SYSTEM AND METHOD FOR NETWORK ACCESS WITHOUT | FR | 991875.6 | 10/20/2000 | 1234246 | 8/12/2015 | 1234246 | 8/28/2002 |
| SYSTEM AND METHOD FOR NETWORK ACCESS WITHOUT | GB | 991875.6 | 10/20/2000 | 1234246 | 8/12/2015 | 1234246 | 8/28/2002 |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| ZONE MIGRATION IN NETWORK ACCESS | CN | 2.0108E+11 | 7/2/2010 | ZL201080037226.9 | 12/3/2014 | CN 102484593 A | 5/30/2012 |
| SYSTEMS AND METHODS FOR INJECTING CONTENT | SG | 200902128-8 | 9/28/2007 | 151035 | 11/13/2014 | | |
| ZONE MIGRATION IN NETWORK ACCESS | SG | 201200009-7 | 7/2/2010 | 177476 | 9/9/2014 | | |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| ZONE MIGRATION IN NETWORK ACCESS | MX | MX/a/2012/000355 | 7/2/2010 | 321671 | 6/25/2014 | | 4/1/2012 |
| SYSTEMS AND METHODS FOR DYNAMIC BANDWIDTH MANAGEMENT ON A PER SUBSCRIBER BASIS IN A | HK | 7113601.7 | 10/20/2000 | 1105493 | 4/25/2014 | HK1105493 | 2/15/2008 |
| SYSTEMS AND METHODS FOR INJECTING CONTENT | CN | 2.0078E+11 | 9/28/2007 | ZL200780041876.9 | 12/4/2013 | CN101536462A | 9/16/2009 |
| SYSTEMS AND METHODS FOR DYNAMIC BANDWIDTH MANAGEMENT ON A PER SUBSCRIBER BASIS IN A | DE | 7100292.7 | 10/20/2000 | 600 48 263.4 | 9/18/2013 | 1819108 | 8/15/2007 |
| SYSTEMS AND METHODS FOR DYNAMIC BANDWIDTH MANAGEMENT ON A PER SUBSCRIBER BASIS IN A | EP | 7100292.7 | 10/20/2000 | 1819108 | 9/18/2013 | 1819108 | 8/15/2007 |
| SYSTEMS AND METHODS FOR DYNAMIC BANDWIDTH MANAGEMENT ON A PER SUBSCRIBER BASIS IN A | FR | 7100292.7 | 10/20/2000 | 1819108 | 9/18/2013 | 1819108 | 8/15/2007 |
| SYSTEMS AND METHODS FOR DYNAMIC BANDWIDTH MANAGEMENT ON A PER SUBSCRIBER BASIS IN A | GB | 7100292.7 | 10/20/2000 | 1819108 | 9/18/2013 | 1819108 | 8/15/2007 |
| NOMADIC TRANSLATOR OR | BR | PI9808014-8 | 3/12/1998 | PI9808014-8 | 6/25/2013 | | |
| SYSTEMS AND METHODS FOR INJECTING CONTENT | JP | 2009-530653 | 9/28/2007 | 5292297 | 6/14/2013 | | |
| SYSTEMS AND METHODS FOR REDIRECTING USERS ATTEMPTING TO ACCESS A NETWORK SITE | CA | 2698604 | 10/20/2000 | 2698604 | 4/23/2013 | | |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| ZONE MIGRATION IN NETWORK ACCESS | ZA | 2012/00071 | 7/2/2010 | 2012/00071 | 9/26/2012 | | 9/26/2012 |
| SYSTEMS AND METHODS FOR PROVIDING DYNAMIC NETWORK AUTHORIZATION, AUTHENTICATION AND | JP | 2001-533680 | 10/20/2000 | 5084086 | 9/14/2012 | | |

KL2 3041638.19

038642/00003/8962130v2

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| SYSTEMS AND METHODS FOR REDIRECTING USERS ATTEMPTING TO ACCESS A NETWORK SITE | JP | 2001-533719 | 10/20/2000 | 5047436 | 7/27/2012 | 2003-513524 A | 4/8/2003 |
| SYSTEMS AND METHODS FOR REDIRECTING USERS ATTEMPTING TO ACCESS A NETWORK SITE | JP | 2010-069550 | 10/20/2000 | 4846036 | 10/21/2011 | | |
| SYSTEMS AND METHODS FOR PROVIDING DYNAMIC NETWORK AUTHORIZATION, AUTHENTICATION AND | HK | 10101833.7 | 10/20/2000 | 1135534 | 9/2/2011 | 1135534A | 6/4/2010 |
| SYSTEMS AND METHODS FOR PROVIDING DYNAMIC NETWORK AUTHORIZATION, AUTHENTICATION AND | JP | 2010-167190 | 10/20/2000 | 4791589 | 7/29/2011 | | |
| INFORMATION AND CONTROL CONSOLE FOR USE WITH A NETWORK GATEWAY INTERFACE | CA | 2388601 | 10/16/2000 | 2388601 | 7/5/2011 | | |
| SYSTEMS AND METHODS FOR INJECTING CONTENT | AU | 2007303531 | 9/28/2007 | 2007303531 | 6/16/2011 | | 4/10/2008 |
| SYSTEMS AND METHODS FOR PROVIDING DYNAMIC NETWORK AUTHORIZATION, AUTHENTICATION AND | DE | 9005810.8 | 10/20/2000 | 600 45 850.4 | 4/13/2011 | 2093928 | 8/26/2009 |
| SYSTEMS AND METHODS FOR PROVIDING DYNAMIC NETWORK AUTHORIZATION, AUTHENTICATION AND | EP | 9005810.8 | 10/20/2000 | 2093928 | 4/13/2011 | 2093928 | 8/26/2009 |
| SYSTEMS AND METHODS FOR PROVIDING DYNAMIC NETWORK AUTHORIZATION, AUTHENTICATION AND | IT | 9005810.8 | 10/20/2000 | 5.02012E+14 | 4/13/2011 | 2093928 | 8/26/2009 |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| SYSTEMS AND METHODS FOR PROVIDING DYNAMIC NETWORK AUTHORIZATION, AUTHENTICATION AND | ES | 9005810.8 | 10/20/2000 | 2093928 | 4/13/2011 | 2093928 | 8/26/2009 |
| SYSTEMS AND METHODS FOR PROVIDING DYNAMIC NETWORK | FR | 9005810.8 | 10/20/2000 | 2093928 | 4/13/2011 | 2093928 | 8/26/2009 |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| AUTHORIZATION, AUTHENTICATION AND ACCOUNTING | | | | | | | |
| SYSTEMS AND METHODS FOR PROVIDING DYNAMIC NETWORK AUTHORIZATION, AUTHENTICATION AND | GB | 9005810.8 | 10/20/2000 | 2093928 | 4/13/2011 | 2093928 | 8/26/2009 |
| INTELLIGENT NETWORK ADDRESS TRANSLATOR AND METHOD FOR NETWORK ADDRESS TRANSLATION | DE | 3808931.4 | 2/20/2003 | 60336573.6 | 3/30/2011 | 1554860 | 7/20/2005 |
| INTELLIGENT NETWORK ADDRESS TRANSLATOR AND METHOD FOR NETWORK ADDRESS TRANSLATION | EP | 3808931.4 | 2/20/2003 | 1554860 | 3/30/2011 | 1554860 | 7/20/2005 |
| INTELLIGENT NETWORK ADDRESS TRANSLATOR AND METHOD FOR NETWORK ADDRESS TRANSLATION | FR | 3808931.4 | 2/20/2003 | 1554860 | 3/30/2011 | 1554860 | 7/20/2005 |
| INTELLIGENT NETWORK ADDRESS TRANSLATOR AND METHOD FOR NETWORK ADDRESS TRANSLATION | GB | 3808931.4 | 2/20/2003 | 1554860 | 3/30/2011 | 1554860 | 7/20/2005 |
| SYSTEMS AND METHODS FOR PROVIDING DYNAMIC NETWORK AUTHORIZATION, AUTHENTICATION AND | CA | 2388628 | 10/20/2000 | 2388628 | 12/14/2010 | | 5/3/2001 |
| SYSTEMS AND METHODS FOR REDIRECTING USERS ATTEMPTING TO ACCESS A NETWORK SITE | CA | 2388623 | 10/20/2000 | 2388623 | 6/22/2010 | | 5/3/2001 |
| NETWORK USAGE MONITORING DEVICE AND ASSOCIATED | JP | 2001-582972 | 5/4/2001 | 4471554 | 3/12/2010 | | |
| SYSTEMS AND METHODS FOR PROVIDING DYNAMIC NETWORK AUTHORIZATION, AUTHENTICATION AND | EP | 973771.9 | 10/20/2000 | 1222775 | 5/27/2009 | 1222775 | 7/17/2002 |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| SYSTEMS AND METHODS FOR PROVIDING DYNAMIC NETWORK AUTHORIZATION, AUTHENTICATION AND | GB | 973771.9 | 10/20/2000 | 1222775 | 5/27/2009 | 1222775 | 7/17/2002 |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| SYSTEMS AND METHODS FOR DYNAMIC BANDWIDTH MANAGEMENT ON A PER SUBSCRIBER BASIS IN A | BE | 973770.1 | 10/20/2000 | 1232610 | 1/7/2009 | 1232610 | 8/21/2002 |
| SYSTEMS AND METHODS FOR DYNAMIC BANDWIDTH MANAGEMENT ON A PER SUBSCRIBER BASIS IN A | DE | 973770.1 | 10/20/2000 | 60041352.7 | 1/7/2009 | 1232610 | 8/21/2002 |
| SYSTEMS AND METHODS FOR DYNAMIC BANDWIDTH MANAGEMENT ON A PER SUBSCRIBER BASIS IN A | EP | 973770.1 | 10/20/2000 | 1232610 | 1/7/2009 | 1232610 | 8/21/2002 |
| SYSTEMS AND METHODS FOR DYNAMIC BANDWIDTH MANAGEMENT ON A PER SUBSCRIBER BASIS IN A | ES | 973770.1 | 10/20/2000 | 1232610 | 1/7/2009 | 1232610 | 8/21/2002 |
| SYSTEMS AND METHODS FOR DYNAMIC BANDWIDTH MANAGEMENT ON A PER SUBSCRIBER BASIS IN A | FR | 973770.1 | 10/20/2000 | 1232610 | 1/7/2009 | 1232610 | 8/21/2002 |
| SYSTEMS AND METHODS FOR DYNAMIC BANDWIDTH MANAGEMENT ON A PER SUBSCRIBER BASIS IN A | GB | 973770.1 | 10/20/2000 | 1232610 | 1/7/2009 | 1232610 | 8/21/2002 |
| SYSTEMS AND METHODS FOR DYNAMIC BANDWIDTH MANAGEMENT ON A PER SUBSCRIBER BASIS IN A | IT | 973770.1 | 10/20/2000 | 5.0201E+14 | 1/7/2009 | 1232610 | 8/21/2002 |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| SYSTEMS AND METHODS FOR DYNAMIC BANDWIDTH MANAGEMENT ON A PER SUBSCRIBER BASIS IN A | NL | 973770.1 | 10/20/2000 | 1232610 | 1/7/2009 | 1232610 | 8/21/2002 |
| NOMADIC TRANSLATOR OR | CA | 2283964 | 3/12/1998 | 2283964 | 5/6/2008 | | 9/17/1998 |
| NETWORK USAGE MONITORING DEVICE AND ASSOCIATED | CN | 1810733.8 | 5/4/2001 | ZL01810733.8 | 4/2/2008 | 1433615 | 7/30/2003 |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| SYSTEMS AND METHODS FOR REDIRECTING USERS ATTEMPTING TO ACCESS A NETWORK SITE | AU | 2006207853 | 10/20/2001 | 2006207853 | 2/21/2008 | | 9/28/2006 |
| NOMADIC TRANSLATOR OR | DE | 98909121 | 3/12/1998 | 698 38 095.9 | 7/18/2007 | 968596 | 1/5/2000 |
| NOMADIC TRANSLATOR OR | EP | 98909121 | 3/12/1998 | 968596 | 7/18/2007 | 968596 | 1/5/2000 |
| NOMADIC TRANSLATOR OR | FR | 98909121 | 3/12/1998 | 968596 | 7/18/2007 | 968596 | 1/5/2000 |
| NOMADIC TRANSLATOR OR | GB | 98909121 | 3/12/1998 | 968596 | 7/18/2007 | 968596 | 1/5/2000 |
| SYSTEMS AND METHODS FOR REDIRECTING USERS ATTEMPTING TO ACCESS A NETWORK SITE | KR | 10-2002-7005164 | 10/20/2000 | 734965 | 6/27/2007 | | |
| SYSTEMS AND METHODS FOR REDIRECTING USERS ATTEMPTING TO ACCESS A NETWORK SITE | CN | 815828.2 | 10/20/2000 | ZL00815828.2 | 5/2/2007 | CN1433622A | 7/30/2003 |
| SYSTEMS AND METHODS FOR PROVIDING DYNAMIC NETWORK AUTHORIZATION, AUTHENTICATION AND | KR | 10-2002-7005174 | 10/20/2000 | 687837 | 2/21/2007 | 687837 | 2/27/2007 |
| NETWORK USAGE MONITORING DEVICE AND ASSOCIATED | CA | 2408233 | 5/4/2001 | 2408233 | 1/9/2007 | | |
| INFORMATION AND CONTROL CONSOLE FOR USE WITH A NETWORK GATEWAY INTERFACE | JP | 2001-533716 | 10/16/2000 | 3880856 | 11/17/2006 | 3880856 | 2/14/2007 |
| INFORMATION AND CONTROL CONSOLE FOR USE WITH A NETWORK GATEWAY INTERFACE | DE | 972188.7 | 10/16/2000 | 60029819.1 | 8/2/2006 | 1234425 | 8/28/2002 |
| INFORMATION AND CONTROL CONSOLE FOR USE WITH A NETWORK GATEWAY INTERFACE | EP | 972188.7 | 10/16/2000 | 1234425 | 8/2/2006 | 1234425 | 8/28/2002 |
| INFORMATION AND CONTROL CONSOLE FOR USE WITH A NETWORK GATEWAY INTERFACE | FR | 972188.7 | 10/16/2000 | 1234425 | 8/2/2006 | 1234425 | 8/28/2002 |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| INFORMATION AND CONTROL CONSOLE FOR USE WITH A NETWORK GATEWAY INTERFACE | GB | 972188.7 | 10/16/2000 | 1234425 | 8/2/2006 | 1234425 | 8/28/2002 |
| INFORMATION AND CONTROL CONSOLE FOR USE WITH A NETWORK GATEWAY INTERFACE | NL | 972188.7 | 10/16/2000 | 1234425 | 8/2/2006 | 1234425 | 8/28/2002 |

| NOMADIC TRANSLATOR OR | CN | 98805023.4 | 3/12/1998 | ZL98805023.4 | 7/5/2006 | CN1273727A | 11/15/2000 |
|---|---|---|---|---|---|---|---|
| ESTABLISHING DYNAMIC TUNNEL ACCESS SESSIONS IN A COMMUNICATION NETWORK | DE | 972302.4 | 10/20/2000 | 60028229.5 | 5/24/2006 | 1226687 | 7/31/2002 |
| ESTABLISHING DYNAMIC TUNNEL ACCESS SESSIONS IN A COMMUNICATION NETWORK | EP | 972302.4 | 10/20/2000 | 1226687 | 5/24/2006 | 1226687 | 7/31/2002 |
| ESTABLISHING DYNAMIC TUNNEL ACCESS SESSIONS IN A COMMUNICATION NETWORK | FR | 972302.4 | 10/20/2000 | 1226687 | 5/24/2006 | 1226687 | 7/31/2002 |
| ESTABLISHING DYNAMIC TUNNEL ACCESS SESSIONS IN A COMMUNICATION NETWORK | GB | 972302.4 | 10/20/2000 | 1226687 | 5/24/2006 | 1226687 | 7/31/2002 |
| ESTABLISHING DYNAMIC TUNNEL ACCESS SESSIONS IN A COMMUNICATION NETWORK | NL | 972302.4 | 10/20/2000 | 1226687 | 5/24/2006 | 1226687 | 7/31/2002 |
| INFORMATION AND CONTROL CONSOLE FOR USE WITH A NETWORK GATEWAY INTERFACE | KR | 10-2002-7005059 | 10/16/2000 | 10-0559357 | 3/3/2006 | | 3/15/2006 |
| INFORMATION AND CONTROL CONSOLE FOR USE WITH A NETWORK GATEWAY INTERFACE | CN | 815982.3 | 10/16/2000 | ZL00815982.3 | 12/21/2005 | CN1408169 | 4/2/2003 |
| SYSTEMS AND METHODS FOR REDIRECTING USERS ATTEMPTING TO ACCESS A NETWORK SITE | BE | 975338.5 | 10/20/2000 | 1222791 | 6/1/2005 | EP1222791 | 5/3/2001 |
| SYSTEMS AND METHODS FOR REDIRECTING USERS ATTEMPTING TO ACCESS A NETWORK SITE | DE | 975338.5 | 10/20/2000 | 60020588.6 | 6/1/2005 | EP1222791 | 5/3/2001 |
| SYSTEMS AND METHODS FOR REDIRECTING USERS ATTEMPTING TO ACCESS A NETWORK SITE | EP | 975338.5 | 10/20/2000 | 1222791 | 6/1/2005 | EP1222791 | 5/3/2001 |

| SYSTEMS AND METHODS FOR REDIRECTING USERS ATTEMPTING TO ACCESS A NETWORK SITE | ES | 975338.5 | 10/20/2000 | 1222791 | 6/1/2005 | EP1222791 | 5/3/2001 |
|---|---|---|---|---|---|---|---|
| SYSTEMS AND METHODS FOR REDIRECTING USERS ATTEMPTING TO ACCESS A NETWORK SITE | FR | 975338.5 | 10/20/2000 | 1222791 | 6/1/2005 | EP1222791 | 5/3/2001 |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| SYSTEMS AND METHODS FOR REDIRECTING USERS ATTEMPTING TO ACCESS A NETWORK SITE | GB | 975338.5 | 10/20/2000 | 1222791 | 6/1/2005 | EP1222791 | 5/3/2001 |
| SYSTEMS AND METHODS FOR REDIRECTING USERS ATTEMPTING TO ACCESS A NETWORK SITE | NL | 975338.5 | 10/20/2000 | 1222791 | 6/1/2005 | EP1222791 | 5/3/2001 |
| SYSTEMS AND METHODS FOR PROVIDING DYNAMIC NETWORK AUTHORIZATION, AUTHENTICATION AND | AU | 200112243 | 10/20/2000 | 779137 | 5/5/2005 | | 5/8/2001 |
| NETWORK USAGE MONITORING DEVICE AND ASSOCIATED | CH | 1931065.5 | 5/4/2001 | 1282955 | 2/9/2005 | 1282955 | 2/12/2003 |
| NETWORK USAGE MONITORING DEVICE AND ASSOCIATED | DE | 1931065.5 | 5/4/2001 | 60108861.1 | 2/9/2005 | 1282955 | 2/12/2003 |
| NETWORK USAGE MONITORING DEVICE AND ASSOCIATED | EP | 1931065.5 | 5/4/2001 | 1282955 | 2/9/2005 | 1282955 | 2/12/2003 |
| NETWORK USAGE MONITORING DEVICE AND ASSOCIATED | FR | 1931065.5 | 5/4/2001 | 1282955 | 2/9/2005 | 1282955 | 2/12/2003 |
| NETWORK USAGE MONITORING DEVICE AND ASSOCIATED | GB | 1931065.5 | 5/4/2001 | 1282955 | 2/9/2005 | 1282955 | 2/12/2003 |
| NETWORK USAGE MONITORING DEVICE AND ASSOCIATED | NL | 1931065.5 | 5/4/2001 | 1282955 | 2/9/2005 | 1282955 | 2/12/2003 |
| NETWORK USAGE MONITORING DEVICE AND ASSOCIATED | SG | 200206956-5 | 5/4/2001 | 93120 | 12/30/2004 | | |
| SYSTEMS AND METHODS FOR PROVIDING DYNAMIC NETWORK AUTHORIZATION, AUTHENTICATION AND | CN | 815827.4 | 10/20/2000 | ZL00815827.4 | 12/1/2004 | CN1391754A | 1/15/2003 |
| SYSTEMS AND METHODS FOR PROVIDING DYNAMIC NETWORK AUTHORIZATION, AUTHENTICATION AND | SG | 200202285-3 | 10/20/2000 | 88465 | 9/30/2004 | | |

| NOMADIC TRANSLATOR OR | MX | PA/a/1999/008386 | 3/12/1998 | 222100 | 8/12/2004 | | |
|---|---|---|---|---|---|---|---|
| LOCATION-BASED IDENTIFICATION FOR USE IN A COMMUNICATIONS NETWORK | DE | 989664.8 | 10/20/2000 | 60011799.5 | 6/23/2004 | 1224788 | 7/24/2002 |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| LOCATION-BASED IDENTIFICATION FOR USE IN A COMMUNICATIONS NETWORK | EP | 989664.8 | 10/20/2000 | 1224788 | 6/23/2004 | 1224788 | 7/24/2002 |
| LOCATION-BASED IDENTIFICATION FOR USE IN A COMMUNICATIONS NETWORK | FR | 989664.8 | 10/20/2000 | 1224788 | 6/23/2004 | 1224788 | 7/24/2002 |
| LOCATION-BASED IDENTIFICATION FOR USE IN A COMMUNICATIONS NETWORK | GB | 989664.8 | 10/20/2000 | 1224788 | 6/23/2004 | 1224788 | 7/24/2002 |
| LOCATION-BASED IDENTIFICATION FOR USE IN A COMMUNICATIONS NETWORK | NL | 989664.8 | 10/20/2000 | 1224788 | 6/23/2004 | 1224788 | 7/24/2002 |
| SYSTEMS AND METHODS FOR REDIRECTING USERS ATTEMPTING TO ACCESS A NETWORK SITE | SG | 200202438-8 | 10/20/2000 | 88575 | 5/31/2004 | | |
| INFORMATION AND CONTROL CONSOLE FOR USE WITH A NETWORK GATEWAY INTERFACE | SG | 200202303-4 | 10/16/2000 | 88483 | 5/31/2004 | | |
| NOMADIC TRANSLATOR OR | AU | 66984/98 | 3/12/1998 | 740012 | 2/7/2002 | AU0740012B2 | 10/25/2001 |
| NOMADIC TRANSLATOR OR | NZ | 337772 | 3/12/1998 | 337772 | 1/10/2002 | | |
| SYSTEMS AND METHODS FOR INJECTING CONTENT | EP | 7843538.5 | 9/28/2007 | - | - | 2067337 | 6/10/2009 |
| SYSTEMS AND METHODS FOR INJECTING CONTENT | HK | 9111608.2 | 9/28/2007 | - | - | 1134600A | 4/30/2010 |
| SYSTEMS AND METHODS FOR INJECTING CONTENT | IN | 2354/DELNP/2009 | 9/28/2007 | - | - | | |
| ZONE MIGRATION IN NETWORK ACCESS | EP | 10742932.6 | 7/2/2010 | - | - | 2452461 | 5/16/2012 |
| ZONE MIGRATION IN NETWORK ACCESS | HK | 12111717.5 | 11/16/2012 | - | - | 1171293A | 3/22/2013 |
| ZONE MIGRATION IN NETWORK ACCESS | IN | 913/DELNP/2012 | 7/2/2010 | - | - | | 4/3/2015 |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| SYSTEMS AND METHODS FOR GROUP BANDWIDTH MANAGEMENT IN A COMMUNICATION SYSTEMS | IN | 6503/DELNP/2013 | 7/19/2013 | - | - | | 12/19/2014 |
| HIERARCHICAL RULE-BASED ROUTING SYSTEM | CN | 2.0148E+11 | 10/28/2015 | - | - | CN105359469A | 2/24/2016 |

| HIERARCHICAL RULE-BASED ROUTING SYSTEM | EP | 14714072.7 | 10/14/2015 | - | - | 2974168 | 1/20/2016 |
|---|---|---|---|---|---|---|---|
| HIERARCHICAL RULE-BASED ROUTING SYSTEM | HK | 16108546.4 | 7/19/2016 | - | - | 1220560A | 5/5/2017 |
| SYSTEMS AND METHODS FOR GROUP BANDWIDTH MANAGEMENT IN A COMMUNICATION SYSTEMS | AU | 2016247155 | 10/20/2016 | - | - | - | - |
| SYSTEMS AND METHODS FOR GROUP BANDWIDTH MANAGEMENT IN A COMMUNICATION SYSTEMS | CA | 2825047 | 7/17/2013 | - | - | - | - |

27463152

KL2 3041638.19

038642/00003/8962130v2

# Included Patents

## Captive Portal Patents:

| Title of Invention: | Status: | Application No. | Filing Date: | Patent No: | Date Issued: | PubNumber: | PubDate: |
|---|---|---|---|---|---|---|---|
| SYSTEMS AND METHODS FOR REDIRECTING USERS HAVING TRANSPARENT COMPUTER ACCESS TO A NETWORK USING A GATEWAY DEVICE HAVING REDIRECTION CAPABILITY | Issued | 09/458569 | 8-Dec-1999 | 6636894 | 21-Oct-2003 | | |
| SYSTEMS AND METHODS FOR AUTHORIZING, AUTHENTICATING AND ACCOUNTING USERS HAVING TRANSPARENT COMPUTER ACCESS TO A NETWORK USING A GATEWAY DEVICE | Issued | 09/458602 | 8-Dec-1999 | 8713641 | 29-Apr-2014 | | |
| SYSTEM AND METHOD FOR AUTHORIZING A PORTABLE COMMUNICATION DEVICE | Issued | 13/271099 | 11-Oct-2011 | 8613053 | 17-Dec-2013 | 2012/0030737 A1 | 2-Feb-2012 |
| SYSTEMS AND METHODS FOR REDIRECTING USERS HAVING TRANSPARENT COMPUTER ACCESS TO A NETWORK USING A GATEWAY DEVICE HAVING REDIRECTION CAPABILITY | Issued | 90/007220 | 24-Sep-2004 | 6636894C1 | 28-Mar-2006 | | |
| SYSTEMS AND METHODS FOR PROVIDING DYNAMIC NETWORK AUTHORIZATION, AUTHENTICATION AND ACCOUNTING | Issued | 09/693060 | 20-Oct-2000 | 7194554 | 20-Mar-2007 | | |
| SYSTEMS AND METHODS FOR PROVIDING DYNAMIC NETWORK AUTHORIZATION, AUTHENTICATION AND ACCOUNTING | Issued | 11/427143 | 28-Jun-2006 | 7689716 | 30-Mar-2010 | 2006/0239254 A1 | 26-Oct-2006 |
| SYSTEMS AND METHODS FOR PROVIDING DYNAMIC NETWORK AUTHORIZATION, AUTHENTICATION AND ACCOUNTING | Issued | 12/685585 | 11-Jan-2010 | 8266266 | 11-Sep-2012 | 2010/0115113 A1 | 6-May-2010 |
| SYSTEMS AND METHODS FOR PROVIDING CONTENT AND SERVICES ON A NETWORK SYSTEM | Issued | 12/875043 | 2-Sep-2010 | 8244886 | 14-Aug-2012 | 2010/0332615 A1 | 30-Dec-2010 |
| SYSTEMS AND METHODS FOR PROVIDING CONTENT AND SERVICES ON A NETWORK SYSTEM | Issued | 13/244866 | 26-Sep-2011 | 8156246 | 10-Apr-2012 | 2012/0017009 A1 | 19-Jan-2012 |
| SYSTEMS AND METHODS FOR PROVIDING CONTENT AND SERVICES ON A NETWORK SYSTEM | Issued | 13/329867 | 19-Dec-2011 | 8266269 | 11-Sep-2012 | 2012/0096159 A1 | 19-Apr-2012 |
| SYSTEMS AND METHODS FOR PROVIDING CONTENT AND SERVICES ON A NETWORK SYSTEM | Issued | 13/566904 | 3-Aug-2012 | 8364806 | 29-Jan-2013 | 2012/0303812 A1 | 29-Nov-2012 |
| SYSTEMS AND METHODS FOR PROVIDING CONTENT AND SERVICES ON A NETWORK SYSTEM | Issued | 13/566961 | 3-Aug-2012 | 8370477 | 5-Feb-2013 | 2012/0311152 A1 | 6-Dec-2012 |
| SYSTEMS AND METHODS FOR PROVIDING CONTENT AND SERVICES ON A NETWORK SYSTEM | Issued | 13/659851 | 24-Oct-2012 | 8606917 | 10-Dec-2013 | 2013/0055358 A1 | 28-Feb-2013 |
| SYSTEMS AND METHODS FOR PROVIDING CONTENT AND SERVICES ON A NETWORK SYSTEM | Issued | 14/059213 | 21-Oct-2013 | 8725888 | 13-May-2014 | 2014/0059222 A1 | 27-Feb-2014 |
| SYSTEMS AND METHODS FOR PROVIDING CONTENT AND SERVICES ON A NETWORK SYSTEM | Issued | 14/059263 | 22-Oct-2013 | 8725899 | 13-May-2014 | 2014/0047093 A1 | 13-Feb-2014 |
| SYSTEMS AND METHODS FOR PROVIDING CONTENT AND SERVICES ON A NETWORK SYSTEM | Issued | 14/094712 | 2-Dec-2013 | 8788690 | 22-Jul-2014 | 2014/0089182 A1 | 27-Mar-2014 |
| SYSTEMS AND METHODS FOR PROVIDING CONTENT AND SERVICES ON A NETWORK SYSTEM | Published | 14/335587 | 18-Jul-2014 | 9548935 | 17-Jan-2017 | 2015/0088710 A1 | 26-Mar-2015 |
| SYSTEMS AND METHODS FOR CONTROLLING USER PERCEIVED CONNECTION SPEED | Issued | 14/675563 | 31-Mar-2015 | 9160672 | 13-Oct-2015 | 2015/0236965 A1 | 20-Aug-2015 |

KL2 3041638.19

038642/00003/8962130v2

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| SYSTEMS AND METHODS FOR PROVIDING CONTENT AND SERVICES ON A NETWORK SYSTEM | Pending & Published | 15/406618 | 13-Jan-2017 | | | 2017/02300250 A1 | 10-Aug-2017 |

## Bandwidth Management Patents:

| Title of Invention: | Status: | Application No. | Filing | Patent No: | Date Issued: | PubNumber: | PubDate: |
|---|---|---|---|---|---|---|---|
| SYSTEMS AND METHODS FOR DYNAMIC BANDWIDTH MANAGEMENT ON A PER SUBSCRIBER BASIS IN A COMMUNICATIONS NETWORK | Issued | 09/693481 | 20-Oct-2000 | 7739383 | 15-Jun-2010 | | |
| SYSTEMS AND METHODS FOR DYNAMIC BANDWIDTH MANAGEMENT ON A PER SUBSCRIBER BASIS IN A COMMUNICATIONS NETWORK | Issued | 12/579820 | 15-Oct-2009 | 7698432 | 13-Apr-2010 | 2010/0020685 A1 | 28-Jan-2010 |
| SYSTEMS AND METHODS FOR DYNAMIC DATA TRANSFER MANAGEMENT ON A PER SUBSCRIBER BASIS IN A COMMUNICATIONS NETWORK | Issued | 12/771915 | 30-Apr-2010 | 7953857 | 31-May-2011 | 2010/0208743 A1 | 19-Aug-2010 |
| SYSTEMS AND METHODS FOR DYNAMIC DATA TRANSFER MANAGEMENT ON A PER SUBSCRIBER BASIS IN A COMMUNICATIONS NETWORK | Issued | 13/094769 | 26-Apr-2011 | 8626922 | 7-Jan-2014 | 2011/0199932 A1 | 18-Aug-2011 |
| SYSTEMS AND METHODS FOR DYNAMIC DATA TRANSFER MANAGEMENT ON A PER SUBSCRIBER BASIS IN A COMMUNICATIONS NETWORK | Issued | 14/146971 | 3-Jan-2014 | 9160674 | 13-Oct-2015 | 2014/0215089 A1 | 31-Jul-2014 |
| SYSTEMS AND METHODS FOR DYNAMIC DATA TRANSFER MANAGEMENT ON A PER SUBSCRIBER BASIS IN A COMMUNICATIONS NETWORK | Pending & Published | 14/879567 | 9-Oct-2015 | | | 2016/0205031 A1 | 14-Jul-2016 |

**Schedule X**

**Material Subsidiaries**

See Schedule V.

96

KL2 3041638.19

038642/00003/8962130v2

**Schedule XI**

**Use of Proceeds**

| Loan amount: | $2,650,000 |
| --- | --- |
| Working Capital: | $2,650,000 |

**Schedule XII**

**Intellectual Property Claims**

Lawsuit by Guest-Tek Interactive Entertainment Limited against Exceptional Innovation, Inc. for patent infringement, currently pending in the Federal District Court in Columbus, Ohio.

Lawsuit by Guest-Tek Interactive Entertainment Limited against Nomadix, Inc. for patent infringement, currently pending in the Federal Court of Canada, Calgary, Alberta, Canada.

5/24/2018

**Exceptional Innovation / Ability Insurance Company** **EXHIBIT A**

Compounding Period: Monthly

Nominal Annual Rate: 9.500%

**Cash Flow Data - Loans and Payments**

| | Event | Date | Amount | Number | Period | End Date |
|---|---|---|---|---|---|---|
| 1 | Loan | 05/25/2018 | 2,650,000.00 | 1 | | |
| 2 | Payment | 06/25/2018 | 20,979.17 | 12 | Monthly | 05/25/2019 |
| 3 | Payment | 06/25/2019 | 121,673.40 | 24 | Monthly | 05/25/2021 |

**TValue Amortization Schedule - Normal, 365 Day Year**

| | Date | Payment | Interest | Principal | Balance |
|---|---|---|---|---|---|
| Loan | 05/25/2018 | | | | 2,650,000.00 |
| 1 | 06/25/2018 | 20,979.17 | 20,979.17 | 0.00 | 2,650,000.00 |
| 2 | 07/25/2018 | 20,979.17 | 20,979.17 | 0.00 | 2,650,000.00 |
| 3 | 08/25/2018 | 20,979.17 | 20,979.17 | 0.00 | 2,650,000.00 |
| 4 | 09/25/2018 | 20,979.17 | 20,979.17 | 0.00 | 2,650,000.00 |
| 5 | 10/25/2018 | 20,979.17 | 20,979.17 | 0.00 | 2,650,000.00 |
| 6 | 11/25/2018 | 20,979.17 | 20,979.17 | 0.00 | 2,650,000.00 |
| 7 | 12/25/2018 | 20,979.17 | 20,979.17 | 0.00 | 2,650,000.00 |
| **2018 Totals** | | **146,854.19** | **146,854.19** | **0.00** | |
| 8 | 01/25/2019 | 20,979.17 | 20,979.17 | 0.00 | 2,650,000.00 |
| 9 | 02/25/2019 | 20,979.17 | 20,979.17 | 0.00 | 2,650,000.00 |
| 10 | 03/25/2019 | 20,979.17 | 20,979.17 | 0.00 | 2,650,000.00 |
| 11 | 04/25/2019 | 20,979.17 | 20,979.17 | 0.00 | 2,650,000.00 |
| 12 | 05/25/2019 | 20,979.17 | 20,979.17 | 0.00 | 2,650,000.00 |
| 13 | 06/25/2019 | 121,673.40 | 20,979.17 | 100,694.23 | 2,549,305.77 |
| 14 | 07/25/2019 | 121,673.40 | 20,182.00 | 101,491.40 | 2,447,814.37 |
| 15 | 08/25/2019 | 121,673.40 | 19,378.53 | 102,294.87 | 2,345,519.50 |
| 16 | 09/25/2019 | 121,673.40 | 18,568.70 | 103,104.70 | 2,242,414.80 |
| 17 | 10/25/2019 | 121,673.40 | 17,752.45 | 103,920.95 | 2,138,493.85 |
| 18 | 11/25/2019 | 121,673.40 | 16,929.74 | 104,743.66 | 2,033,750.19 |
| 19 | 12/25/2019 | 121,673.40 | 16,100.52 | 105,572.88 | 1,928,177.31 |
| **2019 Totals** | | **956,609.65** | **234,786.96** | **721,822.69** | |
| 20 | 01/25/2020 | 121,673.40 | 15,264.74 | 106,408.66 | 1,821,768.65 |
| 21 | 02/25/2020 | 121,673.40 | 14,422.34 | 107,251.06 | 1,714,517.59 |
| 22 | 03/25/2020 | 121,673.40 | 13,573.26 | 108,100.14 | 1,606,417.45 |
| 23 | 04/25/2020 | 121,673.40 | 12,717.47 | 108,955.93 | 1,497,461.52 |
| 24 | 05/25/2020 | 121,673.40 | 11,854.90 | 109,818.50 | 1,387,643.02 |
| 25 | 06/25/2020 | 121,673.40 | 10,985.51 | 110,687.89 | 1,276,955.13 |
| 26 | 07/25/2020 | 121,673.40 | 10,109.23 | 111,564.17 | 1,165,390.96 |
| 27 | 08/25/2020 | 121,673.40 | 9,226.01 | 112,447.39 | 1,052,943.57 |
| 28 | 09/25/2020 | 121,673.40 | 8,335.80 | 113,337.60 | 939,605.97 |
| 29 | 10/25/2020 | 121,673.40 | 7,438.55 | 114,234.85 | 825,371.12 |
| 30 | 11/25/2020 | 121,673.40 | 6,534.19 | 115,139.21 | 710,231.91 |
| 31 | 12/25/2020 | 121,673.40 | 5,622.67 | 116,050.73 | 594,181.18 |
| **2020 Totals** | | **1,460,080.80** | **126,084.67** | **1,333,996.13** | |
| 32 | 01/25/2021 | 121,673.40 | 4,703.93 | 116,969.47 | 477,211.71 |
| 33 | 02/25/2021 | 121,673.40 | 3,777.93 | 117,895.47 | 359,316.24 |
| 34 | 03/25/2021 | 121,673.40 | 2,844.59 | 118,828.81 | 240,487.43 |
| 35 | 04/25/2021 | 121,673.40 | 1,903.86 | 119,769.54 | 120,717.89 |
| 36 | 05/25/2021 | 121,673.40 | 955.51 | 120,717.89 | 0.00 |
| **2021 Totals** | | **608,367.00** | **14,185.82** | **594,181.18** | |
| **Grand Totals** | | **3,171,911.64** | **521,911.64** | **2,650,000.00** | |

5-24-18